UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, ST. MARY'S REGIONAL MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR. Secretary of the U.S. Department of Health and Human Services, ET AL.,<br><br>Defendants. | Case No.<br><br>**DECLARATION OF CHAD GOLDER IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

I, Chad Golder, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the General Counsel and Secretary of the American Hospital Association ("AHA"), which is a non-profit association of healthcare organizations and individuals that are committed to improving the health of their communities. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, and my review of the AHA's business records.

2. I became General Counsel and Secretary of the AHA on January 1, 2024, after previously serving as the Association's Senior Vice President and Deputy General Counsel.

3. Before joining the AHA, I was a Partner and founding member of Munger, Tolles and Olson LLP's Washington, D.C. office. I also have spent a significant portion of my career in government service, as a Deputy Associate Attorney General, an Assistant U.S. Attorney in the Eastern District of Virginia, counsel to the Deputy Attorney General, and a law clerk to Justice John Paul Stevens of the U.S. Supreme Court and Judge Merrick Garland of the U.S. Court of

Appeals for the District of Columbia Circuit. I earned my undergraduate and law degrees from Yale University.

4. Founded in 1898, the AHA leads, represents, and serves nearly 5,000 member hospitals, health systems, and other healthcare organizations and 43,000 individual members with the mission of advancing the health of all individuals and communities. Through our representation and advocacy, the AHA ensures that our members' perspectives and needs are heard in national health policy development, legislative, and regulatory debates.

5. More than 2,000 of the AHA's member hospitals and health systems participate in the 340B drug pricing program. These members include disproportionate share hospitals that serve a high number of low-income patients. Many of these members operate on very thin (or negative) margins.

6. I am familiar with the current upfront discount model for the 340B program, drug companies' prior attempts to change that model, and Defendants' current plan to replace the 340B program's discount model with a rebate program starting on January 1, 2026, for nine popular drugs. I submitted comments in opposition to this plan on the AHA's behalf. I also am aware of the harm that this switch to a rebate program will cause the AHA's mission and many of its members if the rebate program is not temporarily enjoined before January 1.

**Defendants' Rebate Program Mandates Participation from the AHA's Members**

7. On July 31, 2025, Defendant Health Resources and Services Administration ("HRSA") announced a new "340B Rebate Model Pilot Program." I understand from the AHA's members that this announcement was made without meaningful consultation with 340B hospitals.

8. Under Defendants' rebate program, beginning January 1, 2026, 340B covered entities are required to purchase nine popular drugs at commercial prices, known as the full

Wholesale Acquisition Cost ("WAC"), and then apply for a rebate after dispensing the purchased drugs to a 340B-eligible patient.

9. The WAC is the "list price" for wholesalers—without any discounts or promotions. I understand from discussions with our members that the WAC is typically several times more expensive than the 340B price and that the WAC for some drugs slated for participation in Defendants' rebate program is more than 100 times the 340B price. Per 340B's implementing regulations, the "ceiling price" for 340B covered entities for name brand drugs (like all of those in Defendants' rebate program) must be set using the Average Manufacturer Price (inclusive of discounts) minus the Unit Rebate Amount (which is currently a minimum of 23.1%).[1]

10. Several of the drugs slated for participation in Defendants' program cost thousands of dollars for a 30-day supply. For example, one 30-day supply of Enbrel is $7,106, Stelara is $13,836, and Imbruvica is $14,934.[2] I understand that, based on a sample of 81 covered entities, The Craneware Group estimated in a comment submitted to HRSA that having to pay WAC upfront would increase those covered entities' actual spend on 340B drugs by more than five times.[3] Many members have informed me that having to pay those prices before receiving rebates will require a significant outlay of their operating capital or cash reserves.

11. Defendants' self-titled "pilot" rebate program is mandatory for covered entities that prescribe any of the drugs for which HRSA has approved rebate program applications. Therefore, all or nearly all of the AHA's more than 2,000 members who participate in the 340B program will be required to participate in the rebate program.

---

[1] *See* 42 C.F.R. § 10.10(a); 340B Health, "340B Drug Pricing Program Overview," https://www.340bhealth.org/members/340b-program/overview/.
[2] *See* Ctrs. for Medicare & Medicaid Servs., "Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026," https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-applicability-year-2026.pdf.
[3] Comment ID HRSA-2025-0001-0076 on the 340B Program Notice (Federal Register No. 2025-14998).

**The AHA's Comments on Defendants' Rebate Program**

12.   Given the importance of the 340B program to our mission of advancing the health of all individuals and communities, the AHA welcomed the opportunity to comment on Defendants' proposed rebate program.

13.   On August 8, 2025, the first day of the comment period, the AHA (along with America's Essential Hospitals, the American Society of Health-Systems Pharmacists, the Association of American Medical Colleges, the Catholic Health Association of the United States, and 340B Health) submitted a comment requesting that Defendant Engels extend the period for comments on the proposed rebate program to September 15 and simultaneously extend the deadlines for drug company rebate plan submissions until October 20 and plan approvals until November 3.[4] We explained that the existing timeline, which provided only one week between the close of comments and drug company plan submissions, made it "impossible for the agency to meaningfully consider, in just seven days, all the feedback it will surely receive."

14.   Defendants did not extend the comment deadline or, as far as I am aware, otherwise respond to our comment or any other comments.

15.   On August 27, 2025, I submitted another comment on behalf of the AHA's more than 2,000 member hospitals and health systems that participate in the 340B drug pricing program in order to express the AHA's serious concerns with Defendants' proposed program.[5] Given that Defendants' conduct to date had indicated an intent to move forward with their proposed program regardless of the public comments, our comment addressed both why the program should not

---

[4] Comment ID HRSA-2025-0001-0005 on the 340B Program Notice (Federal Register No. 2025-14998).
[5] Comment ID HRSA-2025-0001-0052 on the 340B Program Notice (Federal Register No. 2025-14998) (the "AHA Comment").

proceed and what measures must be put in place to minimize the harm it will cause the AHA's members if it does proceed.

16. In the absence of any clearly articulated rationale from HRSA about its reason for shifting to a rebate program, the AHA's comment addressed arguments advanced by drug companies that 1) there is supposedly insufficient oversight of the safety-net healthcare providers participating in the 340B program and 2) drug companies purportedly cannot comply with the Inflation Reduction Act and 340B statute without a rebate model. AHA Comment at 10-11.

17. First, we explained that HRSA's own 340B audit data belies any claim of widespread program integrity concerns at covered entities; for example, HRSA's audits in Fiscal Year 2022 found that 75% of audited drug companies needed to make repayments to hospitals, while only 28% of audited hospitals needed to make repayments to drug companies. *Id.* at 10. We also noted that HRSA already audits participating hospitals at about 10 times the rate it audits participating drug companies. *Id.*

18. Second, we explained that one singular reference to the 340B non-duplication of discounts requirement in the Inflation Reduction Act does not require the upending of a discount model that hospitals have relied upon for more than 30 years. *Id.* at 10-11.

19. Our comment noted that large bipartisan groups of congresspeople had written to the Secretary of Health and Human Services in opposition to a rebate model, including after the passage of the Inflation Reduction Act. *Id.* For example, on September 27, 2024, nearly 200 members of Congress urged HRSA not to approve a rebate model put forth by Johnson & Johnson:

> We write to express our concern over the Johnson & Johnson (J&J) plan to upend more than 30 years of federal law by delaying access to 340B Drug Pricing Program (340B) discounts on pharmaceuticals for certain safety-net hospitals. . . . [We] urge you to use every enforcement tool at your disposal to protect the communities safety-net hospitals serve from this devastating change to 340B. . . .

> This [rebate] model would reduce resources available for providing comprehensive services to patients and communities, undermining the core purpose of 340B. . . .
>
> A rebate model would create significant financial challenges for safety-net hospitals, which already are operating under much lower operating margins than non-340B hospitals. . . .
>
> Many hospitals also would be forced to hire new full-time employees to develop new purchasing arrangements as well as to monitor, validate, and reconcile the rebates. Moreover, there is no existing infrastructure for accumulating and sharing the data that J&J would require for hospital rebate claims.[6]

20. Our comment also explained that drug companies could comply with the Inflation Reduction Act and 340B's longstanding discount model by simply making the maximum fair price for Medicare negotiated drugs available prospectively as is currently done for drugs purchased under the 340B program. AHA Comment at 11. Hospitals could then purchase Medicare negotiated drugs at either the drug's maximum fair price under the Inflation Reduction Act or 340B price, whichever price is lower for that particular drug.

21. Moreover, our comment detailed the significant harm that Defendants' rebate model would cause our members and their patients. As discussed further below, the AHA explained that Defendants' proposed program would limit our members' ability to provide community benefits and to fund critical patient services, put our members at risk of violating their bond covenants, and create expensive administrative burdens. *Id.* at 12-14.

---

[6] Letter to Sec'y Becerra from A. Spanberger et al. (Sept. 27, 2024), https://d12t4t5x3vyizu.cloudfront.net/spanberger.house.gov/uploads/2024/09/Quill-Letter-L20840-Letter-to-HHS-on-JJ-340B-Rebate-Model-Version-1-09-27-2024-@-03-08-PM.pdf.

Since the AHA's comment was submitted, I have seen that a group of more than 160 members of Congress from both parties have also written to Secretary Kennedy to express concerns that Defendants' proposed rebate program "threaten[s] 340B providers' ability to provide care and to keep their doors open to serve low-income communities." Letter to Sec'y Kennedy from D. Matsui et al. (Sept. 8, 2025), https://matsui.house.gov/sites/evo-subsites/matsui.house.gov/files/evo-media-document/20250909-matsui-final-letter-to-hhs_340b-rebate-model-pilot.pdf.

22. If Defendants were to proceed with their planned rebate program, our comment raised that the requirement for drug companies to reimburse "all costs for data submission through an Information Technology (IT) platform" did not come close to covering all of our members' costs to shift to a rebate model. *Id.* at 2-3. We urged Defendants to clarify that drug companies must timely pay all of covered entities' costs involved in the model switch, including increased staffing costs, additional payments to third-party vendors who manage data flows, and potential legal costs in forcing drug companies to comply with the program. *Id.*

23. The AHA's comment also urged Defendants to establish strict enforcement guidelines for drug company non-compliance given that failures to reimburse covered entities constitute impermissible overcharges for medications under 340B's statutory scheme. We pointed out that HRSA's notice and existing online FAQs did not provide sufficient guidance on how HRSA would determine non-compliance or when it would impose a penalty on a drug company for non-compliance. *Id.* at 3-4.

24. Similarly, our comment stressed the need for Defendants to create a dedicated process to solve rebate disputes because of the grave impacts that delays or denials of rebates would have on many of our members' finances. *Id.* at 5-6. We explained that the existing 340B alternative dispute resolution process would not work for Defendants' planned rebate program because of its statutory amount in dispute limits and the extended length of time that the process typically takes (during which period a covered entity would likely be deprived of significant amounts of money it is owed). *Id.* We asked HRSA to create a dispute resolution process that includes, at minimum, a designated human point of contact to receive complaints and a specific timeline for when complaints will be addressed. *Id.* at 6. And to assist in the resolution of disputes,

we also asked that drug companies be required to provide non-conclusory, evidence-based denials of rebates with specific drug company contact information.[7] *Id.*

25. We additionally pointed out that the Beacon platform selected by drug companies is a wholly owned subsidiary of the Berkeley Research Group, which has long been affiliated with drug companies and their trade association. *Id.* at 4-5. We also flagged that Defendants' planned program lacked strict guidelines on how our members' data could be used by Beacon and the drug companies. *Id.* at 5.

26. The AHA advocated for HRSA to engage a single, neutral, *third-party* entity to serve as a clearinghouse for any data submissions required under Defendants' rebate program. We brought to the agency's attention that the Centers for Medicare & Medicaid Services proposed to pilot a 340B claims data repository for use in identifying 340B units for the calculation of Medicare inflation rebates required under the Inflation Reduction Act and suggested that HRSA could use the same repository for the rebate program. *Id.* at 5. This alternative would minimize some of the administrative burden on our members by allowing them to submit claims data to one entity, limit the ability of drug companies to use data for other reasons, and allow HRSA to more easily oversee its program.

27. Finally, our comment asked HRSA to explain the criteria it plans to use to assess the success or failure of its self-titled "pilot" rebate program and to appropriately weigh the costs and administrative burdens of even a single improper rebate delay or denial in its assessment, given the grave stakes for our members of losing their 340B savings and having to spend more money just to continue participating in the program. *Id.* at 7.

---

[7] We also asked the agency to clarify that drug companies cannot deny rebates based on their unilaterally imposed contract pharmacy restrictions. *Id.* at 6-7.

28. On September 12, 2025, pursuant to the Paperwork Reduction Act of 1995, HRSA published a notice regarding an Information Collection Request that included HRSA's estimate of the administrative burden its rebate program would put on covered entities.[8] HRSA estimated that its rebate program would require two hours of work per week for each entity. On September 30, 2025, I submitted a comment in response on behalf of the AHA.[9] I explained that our members believe HRSA had severely underestimated the time burden of its program: the AHA's members anticipate that Defendants' rebate program will require them to "devote, on average, up to two full-time equivalents to manage the entire rebate model process," amounting to 80 hours per week—many multiples of Defendants' estimate of two hours. Our comment also explained that our members projected their administrative costs for the rebate program to range from $150,000 to $500,000 per year, conservatively adding up to over $400 million each year in purely administrative costs.

29. To date, I am not aware of any steps that any Defendant has taken to meaningfully respond to the issues raised in the AHA's comments or any other comment.

### Defendants' Have Not Appropriately Prepared for Implementation

30. In addition to all of the substantive issues with Defendants' proposed rebate program, I understand from our members that they still have not received information they need to effectively implement this program at their hospitals.

31. HRSA has created a list of FAQs on its website and occasionally updated it since the comment period,[10] but these FAQs still do not address key concerns the AHA's members have

---

[8] 90 Fed. Reg. 44197.
[9] The Am. Hosp. Ass'n, *AHA Letter to HRSA re: The 340B Rebate Model Pilot Program* (Sept. 30, 2025), https://www.aha.org/lettercomment/2025-09-30-aha-letter-hrsa-re-340b-rebate-model-pilot-program.
[10] *See* HRSA, "340B Rebate Model Pilot Program" (Nov. 2025), https://www.hrsa.gov/opa/340b-model-pilot-program.

about rebate program implementation. For example, in response to the question "What should I do if I do not receive a rebate within 10 days of submitting claims data?," HRSA advises:

> Covered entities who are not receiving rebates within the 10-day timeframe after submitting complete and accurate data, should first contact the manufacturer and IT platform vendor to report concerns. If after attempting to work with the manufacturer a covered entity cannot resolve the issue with the manufacturer, the covered entity should email 340BPricing@hrsa.gov with the details of its concern. A manufacturer that is consistently unable to timely resolve rebate reimbursement issues may have its participation in the pilot program revoked.

This information does not address, among other issues: 1) who, between the manufacturer and the IT platform, is ultimately responsible for resolving issues; 2) to what degree covered entities will be expected to "attempt[] to work with the manufacturer" before HRSA will intervene; or 3) what it means for a manufacturer to be "consistently unable to timely resolve rebate reimbursement issues." All of this information is critical to our members' ability to plan for implementation of Defendants' rebate program, and Defendants have given very little guidance about what recourse covered entities can expect when drug companies do not comply with the 10-day window for issuing rebates.

32. The AHA also is concerned that Defendants' rebate program will not be operationally prepared to handle our members' rebate claims starting on January 1. It is my understanding that Defendants or their third-party administrators have not yet even tested the Beacon software program on which their entire rebate program relies. If this software does not function as intended, safety-net providers will be without a mechanism to obtain 340B pricing for nine popular and costly drugs in just one month.

33. The AHA also is concerned about the terms and conditions that are associated with the Beacon software program. I have heard from numerous AHA members that they would not ordinarily agree to such one-sided conditions. Among other things, AHA members have raised

concerns about 1) allowing their claims data to be sold for profit, 2) cybersecurity and data privacy risks, and 3) strict limits on liability. I also have learned that members have tried to negotiate those conditions, but the creator of the Beacon software has refused to make any changes and Defendants have refused to step in.

**Defendants' Planned Rebate Program Will Cause Harm to the AHA's Members**

34. Despite the AHA and other commenters detailing the harm that Defendants' rebate program would cause, I am not aware that Defendants have taken any meaningful steps to change the rebate program to mitigate harm to hospitals and other safety-net healthcare providers.

35. Even temporary outlays of the large amounts of cash needed to purchase drugs at WAC can have dire consequences for our members. For example, it is common for hospitals that participate in the 340B program to use bond financing to raise money for new projects that enhance patient care. Those bonds typically include covenants that require the hospital to maintain a certain number of days of cash on hand. Forced expenditures for new drugs under Defendants' rebate program threaten to deplete some of our members' cash reserves beyond what is required by their bond covenants, and violating those covenants has severe consequences ranging from credit rating downgrades to increased costs of borrowing to closure.

36. With looming uncertainty about how much they will have to pay for drugs next year because of Defendants' rebate program, some of our members have also told the AHA that they have put off important new projects altogether—including delaying expansions of patient services, facilities improvements, and construction of new clinics to expand access to care.

37. Defendants' rebate program also jeopardizes the continuation of the many patient support programs that our members currently use their 340B savings for, including free or discounted medication programs, community health screenings and vaccine clinics, free or reduced

cost care for uninsured patients, and other healthcare support programs. With so many of our members operating on very thin or negative margins, they do not have excess funds to sustain their current service levels if forced to pay more for access to drugs.

38. Our member hospitals have been operating under the 340B discount model for over three decades and have built their pharmacy workflows and compliance practices around that model. The new requirements to submit additional deidentified patient-specific data to drug companies, track rebates that they are owed, and follow up with drug companies to make sure that rebates are actually paid will require additional resources that could otherwise be used for patient care. Our members have informed the AHA that they expect to need, on average, two additional full-time employees to comply with Defendants' rebate program, who will have to be hired anew with diverted funds or taken away from other tasks in service of the hospital's mission.

39. Between additional staffing costs, software expenditures, and other operational burdens, the AHA conservatively estimates that Defendants' planned rebate program will cost our members more than $400 million annually in administrative costs alone. Defendants have done nothing to clarify whether these additional administrative costs will be compensated by drug companies and, if so, how.

40. The AHA and other commenters, including some of our members themselves, brought imminent harms to Defendants' attention. But Defendants have chosen not to address them, instead moving ahead toward a January 1 implementation date for their rebate program. Our members have already started to incur non-recoverable costs in attempting to prepare for Defendants' rebate program, and the impact of these costs on patient care across the country will only worsen if Defendants' rebate program is not at least put on hold.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 26th day of November, 2025 at Washington, D.C.

*/s/ Chad Golder*

Chad Golder
