## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

THE AMERICAN HOSPITAL
ASSOCIATION, THE MAINE HOSPITAL
ASSOCIATION, ST. MARY'S REGIONAL
MEDICAL CENTER, NATHAN LITTAUER
HOSPITAL & NURSING HOME, UNITY
MEDICAL CENTER, and DALLAS
COUNTY MEDICAL CENTER,

     *Plaintiffs*,

   v.

ROBERT F. KENNEDY, JR., Secretary of the
U.S. Department of Health and Human
Services, THOMAS J. ENGELS,
Administrator, Health Resources and Services
Administration, THE HEALTH RESOURCES
AND SERVICES ADMINISTRATION, THE
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, and
THE UNITED STATES OF AMERICA.

     *Defendants*.

Case No. 2:25-cv-00600-JAW

**BRIEF FOR PROPOSED INTERVENORS ABBVIE, INC., PHARMACYCLICS, LLC, ASTRAZENECA PHARMACEUTICALS LP, PHARMACEUTICAL RESEARCH & MANUFACTURERS OF AMERICA (PHRMA), BOEHRINGER INGELHEIM PHARMACEUTICALS INC., AND NOVO NORDISK INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER[1]**

---

[1] Proposed Intervenors file this opposition pursuant to the schedule set during the Court's December 8, 2025 telephone conference. ECF 31.

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

      A.    The 340B Pricing Program and the Inflation Reduction Act. ................................ 3

      B.    HRSA's Rebate Model Pilot Program. ................................................................. 5

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT .................................................................................................................... 7

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........................... 7

      A.    HRSA Addressed A New Problem Consistent With Its Past Positions. ............... 8

      B.    HRSA Was Not Required To Respond To Comments. ....................................... 10

      C.    A Cost-Benefit Analysis Supports The Pilot Program. ...................................... 12

      D.    Plaintiffs Cannot Show HRSA Had Viable Alternatives To Consider. ............... 13

II.      THE EQUITABLE FACTORS FAVOR INTERVENORS. .......................................... 15

      A.    An Injunction Will Irreparably Harm Intervenors. ............................................. 15

      B.    Plaintiffs Will Not Suffer Any Harm Absent Emergency Relief. ....................... 15

      C.    The Balance of Equities And The Public Interest Favor Intervenors. ................ 18

      D.    Plaintiffs' Motion For Emergency Relief Is Untimely And Unreasonable. ......... 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Drummond*,
   -- F. Supp. 3d --, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025)..........................................19

*Blanca Telephone Co. v. FCC*,
   743 F.3d 860 (D.C. Cir. 2014) ...............................................................................................11

*Central Me. Power Co. v. FERC*,
   252 F.3d 34 (1st Cir. 2001) ....................................................................................................20

*City of Portland v. EPA*,
   507 F.3d 706 (D.C. Cir. 2007) ...............................................................................................11

*Doe ex rel. Doe v. Portland Pub. Schs.*,
   701 F. Supp. 3d 18 (D. Me. 2023) ...........................................................................................7

*Eli Lilly & Co. v. Kennedy*,
   2025 WL 1423630 (D.D.C. May 15, 2025)...........................................................................7, 9

*FCC v. Fox Television Studios*,
   556 U.S. 502 (2009).............................................................................................................9, 10

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)................................................................................................................13

*FDA v. Wages & White Lion Invs., L.L.C.*,
   604 U.S. 542 (2025).....................................................................................................8, 10, 16

*Franks v. Salazar*,
   816 F. Supp. 2d 49 (D.D.C. 2011) .........................................................................................11

*Glob. Tower Assets, LLC v. Town of Rome*,
   810 F.3d 77 (1st Cir. 2016)....................................................................................................19

*Housatonic River Initiative v. EPA*,
   75 F.4th 248 (1st Cir. 2023)...................................................................................................12

*Hudson v. FAA*,
   192 F.3d 1031 (D.C. Cir. 1999) .............................................................................................12

*Johnson & Johnson Health Care Sys. Inc. v. Kennedy*,
   2025 WL 1783901 (D.D.C. June 27, 2025)....................................................................7, 9, 17

*Nat'l Shooting Sports Found. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ..................................................................14, 15

*NCTA – Internet & Television Ass'n v. Frey*,
    2020 WL 2529359 (D. Me. May 18, 2020) ..............................................18

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ..................................................................16, 17

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) ........................................................................17

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ....................................................................................7

*Thompson v. Clark*,
    741 F.2d 401 (D.C. Cir.1984) ....................................................................15

*Town of Weymouth v. Mass. Dep't of Env't Prot.*,
    973 F.3d 143 (1st Cir. 2020) ......................................................................20

*Wages & White Lion Invs., LLC v. U.S. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ....................................................................16

*We the People PAC v. Bellows*,
    512 F. Supp. 3d 74 (D. Me. 2021) ............................................................20

**Statutes**

5 U.S.C. § 551 ....................................................................................................11

5 U.S.C. § 553 ....................................................................................................11

42 U.S.C. § 256b ................................................................................................1, 3

42 U.S.C. § 256b(a) ...........................................................................1, 5, 10, 11

42 U.S.C. § 256b(d) ...........................................................................................16

42 U.S.C. § 1320f ..............................................................................................4

42 U.S.C. § 1320f-2(a) .....................................................................................4, 13

42 U.S.C. § 1320f-2(c) .....................................................................................4

42 U.S.C. § 1320f-2(d) .....................................................................................4, 10, 16

42 U.S.C. § 1320f-6 ..........................................................................................4, 12

42 U.S.C. § 1396r-8 ..........................................................................................................3

**Regulations**

42 C.F.R. § 10.21(a).......................................................................................................16

62 Fed. Reg. 45,823 (Aug. 29, 1997)............................................................................9

63 Fed. Reg. 35,239 (June 29, 1998) ............................................................................9

75 Fed. Reg. 10,272 (March 5, 2010) ..........................................................................16

90 Fed. Reg. 36,163 (Aug. 1, 2025).....................................................................*passim*

## INTRODUCTION

Plaintiffs' motion for emergency relief should be denied. Months ago, on August 1, 2025, the government announced it intended to launch a Pilot Program to test how drug manufacturers could use a rebate model to provide reduced prices to eligible healthcare providers (called "covered entities") participating in the federal 340B Program. The 340B Program allows covered entities to buy steeply discounted drugs from manufacturers participating in Medicaid and Medicare Part B, but they can dispense those drugs only to their own eligible patients and cannot generate duplicate discounts or rebates. 42 U.S.C. § 256b. The relevant federal statute expressly authorizes the use of *either* "discounts" or "rebates" to afford 340B prices—there is no dispute here that a 340B rebate model is substantively lawful. *Id.* § 256b(a).

And a 340B rebate mechanism is needed now more than ever. Congress recently imposed new, competing obligations on certain manufacturers. The Inflation Reduction Act (IRA) created the "Drug Price Negotiation Program" (DPNP), which initially requires nine manufacturers to offer certain drugs to hospitals and pharmacies treating Medicare-covered individuals at a "maximum fair price" (MFP) that HHS sets. Because Medicare patients often fill their prescriptions at 340B covered entities (or their off-site contract pharmacies), manufacturers often must determine *which* of those two prices applies to a dispensing event: 340B or MFP? By statute, manufacturers must provide *only* the lower price, not *both* discounts. Failure to provide the correct price within fourteen days exposes manufacturers to severe monetary penalties. The Pilot Program challenged here was primarily designed to enable manufacturers to comply with their statutory obligations that commence in under three weeks. Those manufacturers cannot make the required 340B or MFP determination on their own; they need claims data from the covered entities and their pharmacies. As explained below and in the proposed Intervenors' declarations, without the Pilot Program, manufacturers could not fully satisfy their deduplication obligations and would face

losses exceeding $4 billion in 2026 alone, in addition to the risk of severe monetary penalties.[2]

Plaintiffs waited until December—more than a month after manufacturers' individual rebate models were approved and less than a month before the Pilot Program starts and manufacturers' penalty-backed statutory obligations kick in—to sue and seek emergency relief. They claim the agency embarked on the Pilot Program without engaging in inapplicable notice-and-comment or fully explaining its cost-benefit calculus. But the agency's decisions to establish a pilot program and accept Intervenors into it were not arbitrary and capricious. To the contrary, they represent, after months of discussion, the bare minimum the agency could do to reconcile overlapping statutory pricing obligations that were thrust upon manufacturers and that manufacturers lack other viable means to satisfy. The agency adequately explained its reasoning. And if more explanation were needed, the proper remedy would be to require ***more agency explanation***, not an injunction.

Just as importantly, the balance of equities disfavors an injunction. The Pilot Program will apply to a limited number of products (accounting for approximately 2% of the 340B Program's total value).[3] Importantly, the Pilot Program will not change what discounts Plaintiffs receive from the 340B Program or create a cash-flow problem. And contrary to Plaintiffs' contentions, covered entities already collect, maintain, and routinely transmit the claims data at issue, rendering claims that covered entities will face millions of dollars in compliance costs both speculative and unsupported. Even indulging Plaintiffs' estimates, however, there is no doubt that granting

---

[2] All proposed Intervenors seek leave to participate at the December 19, 2025 hearing and intend to present argument through one counsel. Proposed Intervenors are AbbVie, Inc., Pharmacyclics, LLC, AstraZeneca Pharmaceuticals LP, Pharmaceutical Research & Manufacturers of America (PhRMA), Boehringer Ingelheim Pharmaceuticals Inc., and Novo Nordisk Inc. *See* ECF 36, 39, 45, 50. PhRMA is a trade association representing eight of the nine manufacturers in the Pilot Program, as well as other interested members.

[3] There is a dispute over the exact number of medications involved in the Pilot Program, as CMS aggregated six of Novo Nordisk's medications and treated them as a single product. That dispute is irrelevant to Plaintiffs' motion.

emergency relief would subject Intervenors to vastly greater harms. Without the ability to collect claims data and effectuate the 340B price through a rebate model, Intervenors risk accruing debilitating penalties under the DPNP and providing enormous duplicate discounts that are inconsistent with federal law. The nine participating manufacturers will lose $4 billion in 2026 alone if enjoined from implementing their agency-approved rebate models. And that figure just covers losses attributable to duplicate discounts; it does not account for statutory penalties and the time, labor, and resources spent preparing for their new DPNP obligations and the Pilot Program.

Finally, Plaintiffs' request for emergency relief is untimely. They have known about the Pilot Program since the agency's announcement on August 1. Although individual rebate models were first approved in October, Plaintiffs' suit does not engage with the specifics of those individual rebate plans. Plaintiffs contest the propriety of the Pilot Program as a whole. Plaintiffs' suit is thus a belated challenge to the agency's August 1 decision to have a rebate pilot at all. Plaintiffs' unjustified and prejudicial delay alone justifies denying emergency relief.

Plaintiffs' motion for emergency relief threatens grave harm to Intervenors and the public interest while providing Plaintiffs no corresponding benefit. It should be denied.

## BACKGROUND

### A.    The 340B Pricing Program and the Inflation Reduction Act.

**1.** The Pilot Program concerns two overlapping federal drug-pricing programs. The first is the 340B Program, which requires manufacturers participating in Medicaid and Medicare Part B to offer drugs "at a ceiling price" to certain enumerated healthcare providers known as "covered entities" that serve indigent and uninsured patients. 42 U.S.C. § 256b. The "ceiling price" is set by a statutory formula and is often pennies on the dollar. *See id.* § 1396r-8(c); *see also, e.g.*, ECF 36-2, ¶ 3. The second is the new DPNP created by the IRA. The DPNP requires HHS to set a "maximum fair price" (MFP) for certain drugs. CMS, *Medicare Drug Price Negotiation Program:*

*Selected Drugs for Initial Price Applicability Year 2026* (Aug. 15, 2024), https://tinyurl.com/2wf6wv8t. Manufacturers must make selected drugs available to certain Medicare-covered individuals at the MFP. *See* 42 U.S.C. §§ 1320f(a), (c)(2), 1320f-2(a)(3). Failure to provide the MFP exposes a manufacturer to civil monetary penalties reaching into the millions per day. *Id.* §§ 1320f-6(c), 1320f-2(a)(5). HHS has agreed that a manufacturer may satisfy its MFP obligation by using a rebate mechanism—that is, by "retrospectively transmitting payment for the difference between the dispensing entity's acquisition cost and the MFP (*i.e.*, the MFP refund amount)," within fourteen days.[4] That rebate-based approach makes sense because manufacturers sell their drugs in bulk, when it is impossible to know which particular drugs, if any, will later be sold to MFP-eligible patients.

**2.** The DPNP creates a new problem for manufacturers, like Intervenors, who produce drugs subject to both the MFP and the 340B ceiling price. Starting January 1, 2026, such manufacturers must provide the lower of the two prices—***but not both,*** which combined could be so ruinously steep as to produce a negative price. *See id.* § 1320f-2(d). The DPNP is explicit on that point: Manufacturers "shall not be required to provide" both the MFP and the 340B price. *Id.* Such "duplicate discounts" are therefore inconsistent with federal law. But the government has disclaimed responsibility for identifying and deduplicating MFP-340B dispenses, leaving manufacturers to shoulder that burden.[5]

Manufacturers do not have the information necessary to determine whether a given prescription was 340B-eligible. To meet their new statutory obligations, manufacturers subject to

---

[4] CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2028 and Manufacturer Effectuation of the Maximum Fair Price in 2026, 2027, and 2028* (Sept. 30, 2025) ("IPAY2028 Final Guidance") at 212, https://tinyurl.com/uf86dc2f.

[5] *See* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* (Oct. 2, 2024) ("2026 Guidance") at 54-55, 229-32, https://tinyurl.com/ychztdfu.

the DPNP need "claims data" to determine which discount (if any) to issue within the fourteen-day payment window. Claims data is transaction-level data about a given drug "dispense," *i.e.*, furnishing a drug to a patient. Covered entities already use claims data to determine whether their past drug dispenses were 340B-eligible. ECF 36-2, ¶¶ 19, 27. For purposes of the MFP (but not 340B), manufacturers must use the "Medicare Transaction Facilitator" (MTF), a new system that facilitates data transmission from plans to manufacturers.[6] Under HHS guidance, manufacturers must collect and analyze certain claims data submitted through the MTF to determine whether the MFP is owed on any given drug dispense. IPAY2028 Final Guidance, *supra* note 3, at 216-19. But the limited claims data from the MTF does not enable manufacturers to determine whether a drug dispense is also subject to a 340B discount. ECF 36-1, ¶ 13. So it is functionally impossible to use existing systems to determine whether the MFP or the 340B price applies—and thus prevent duplicate discounts—without claims data concerning 340B eligibility. *See id.*; ECF 36-2, ¶ 22.

### B.    HRSA's Rebate Model Pilot Program.

The 340B statute expressly contemplates manufacturers making the 340B price available either through an upfront "discount" or an after-the-fact "rebate." 42 U.S.C. § 256b(a)(1). In response to widespread concern from manufacturers about their new deduplication obligations, HHS announced the Pilot Program to test a rebate model for effectuating the 340B price to covered entities while ensuring manufacturers are not burdened with duplicate discounts. *See* 90 Fed. Reg. 36,163 (Aug. 1, 2025). While the statute clearly contemplates broader rebate models, the Pilot Program is currently limited to manufacturers with competing MFP and 340B pricing obligations and only to those manufacturers' DPNP-selected drugs. CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026* (Aug. 15, 2024),

---

[6] IPAY2028 Final Guidance, *supra*, at 215 (Sept. 30, 2025) ("IPAY2028 Final Guidance"); *see also* ECF 36-1, ¶ 6.

https://tinyurl.com/5bcw2z4a.

Under the Pilot Program, the manufacturers will initially sell the selected drugs to 340B covered entities at the commercial price. Those manufacturers will then review certain data to determine whether the MFP or the 340B price applies: (1) the limited claims data from the MTF relevant to establishing DPNP eligibility; and (2) certain claims data from the covered entity (which the covered entity *already collects* in the regular course) relevant to establishing an entitlement to a 340B discount. Covered entities will submit their claims data to manufacturers through a platform called Beacon, which "precisely mirrors" a platform covered entities (including some of Plaintiffs here) already use in their 340B operations. Ex. 1 (Vandervelde Dec.), ¶ 8. From that review, the manufacturer will know whether to issue a rebate effecting the MFP or the 340B price. This is currently the only accurate and reliable method of identifying claims subject to 340B pricing, preventing duplicate discounts, and ensuring statutory compliance. ECF 36-2, ¶ 22.

The Pilot Program is also a way for HRSA to explore improvements to existing 340B procedures. In its Notice, HRSA explained that the Pilot Program would enable it "to better understand the merits and shortcomings of the rebate model from stakeholders' perspectives," and that the Program would "inform [its] consideration of any future 340B rebate models." 90 Fed. Reg. at 36,164. Such consideration is valuable as some manufacturers seek to implement rebate models as a method of ensuring covered entities' compliance with the 340B statutory scheme more broadly. *See* Ex. 2 (Banks Decl.), ¶¶ 7, 10–11.

The Pilot Program will begin in less than three weeks, on January 1. *Id.* HRSA chose that date because that is when the DPNP's MFP goes into effect, and thus when the potential for duplicate discounts begins. Intervenors, after investing thousands of hours and millions of dollars, are set to implement their HRSA-approved rebate models on January 1. *See* ECF 36-1, ¶ 17; ECF

6

39-1, ¶ 23; ECF 45-2, ¶ 24; ECF 50-5, ¶¶ 25–26.

## LEGAL STANDARD

Plaintiffs seek an "extraordinary and drastic remedy" used "sparingly and only in a clear and plain case." *Doe ex rel. Doe v. Portland Pub. Schs.*, 701 F. Supp. 3d 18, 32 (D. Me. 2023) (cleaned up). Whether Plaintiffs' motion seeks a TRO or a preliminary injunction, the standard is the same. *Id.* Plaintiffs must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm, that a balance of the equities favors them, and that the public interest favors granting emergency injunctive relief. *Id.* Plaintiffs must make a "clear showing" for each factor. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *see Doe*, 701 F. Supp. 3d at 32.

## ARGUMENT

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiffs have tried and failed to stop 340B rebate models before, and this suit is simply their latest bite at that apple. *See Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *9 n.11 (D.D.C. May 15, 2025); *Johnson & Johnson Health Care Sys. Inc. v. Kennedy*, No. 24-cv-3188 (D.D.C. June 27, 2025), ECF 68.[7] Indeed, these are repeat players with similar arguments. *See Johnson & Johnson*, ECF 68 at 23 (Plaintiff AHA contending that "[c]omplying with the rebate policies will inflict substantial administrative costs" and interfere with Dallas County Medical Center's mission "to help its patients"). Here, they insist that the Pilot Program is arbitrary and capricious because (1) HRSA changed its longstanding disapproval of rebates without explanation, (2) HRSA failed to respond to comments, (3) the Pilot Program is unjustified by cost-benefit balancing, and (4) HRSA ignored better alternatives. These arguments fail. The Pilot Program is a targeted initiative

---

[7] *See also Eli Lilly v. Kennedy*, No. 24-cv-3220 (D.D.C. March 4, 2025), ECF 34; *Bristol Myers Squib v. Kennedy*, No. 24-CV-3337 (D.D.C. March 5, 2025), ECF 37; *Novartis Pharms. Corp. v. Kennedy*, No. 25-CV-117 (D.D.C. March 5, 2025), ECF 30; *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-3496, (D.D.C. March 20, 2025), ECF 38.

necessary to facilitate the nonduplication provisions of the 340B Program and the DPNP, and it is informative to HRSA's consideration of rebate models in the 340B Program more broadly.

### A.  HRSA Addressed A New Problem Consistent With Its Past Positions.

HRSA has not reversed its former views, disavowed earlier agency action, or rescinded earlier regulations.  Rather, it has conceived of a targeted approach to test a model for addressing a new, urgent deduplication problem that the IRA created.

HRSA did not announce the Pilot Program in a vacuum; the Pilot Program is a response to a recent legal development—the IRA's creation of the DPNP.  The IRA created new, onerous deduplication obligations for manufacturers, and those obligations go into effect on January 1.  Under the IRA's new regime, it is critical that the selected manufacturers be able to collect claims data so that they can, within the fourteen-day deadline, identify claims subject to 340B pricing and prevent duplicate discounts for the same dispense.  ECF 36-2, ¶ 22.  Currently, the Pilot Program is the only mechanism for manufacturers to do so.  If manufacturers cannot use this mechanism, they will lack the data necessary to accurately identify claims subject to both programs, exposing them to costly duplicate discounting.  ECF 36-2, ¶ 22.  So it can hardly be said that HRSA drew no "rational connection" between the looming duplicate-discount problem and a pilot designed to combat duplicate discounts.  *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (cleaned up).  Given the January 1 deadline, HRSA reasonably determined that ***now*** is the time for further investigation of a rebate model.  The agency explained as much, noting that it wanted "to address 340B and [MFP] deduplication."  90 Fed. Reg. at 36,163.  This is HRSA responding to a ***new*** problem for the ***first*** time—not HRSA changing its mind.  The agency's judgment calls were thus reasonable and reasonably explained.  That is all the Administrative Procedure Act requires.

Plaintiffs also misstate HRSA's pre-IRA position on rebates.  HRSA has never categorically rejected the propriety of a rebate system—much less any particular pilot program to

*test* that model.  Nor could it:  The 340B statute explicitly authorizes "rebate[s]."  42 U.S.C. § 256b(a)(1).  HHS has administered another 340B rebate program, the AIDS Drug Assistance Program (ADAP), since 1998.  *See* 62 Fed. Reg. 45,823 (Aug. 29, 1997); 63 Fed. Reg. 35,239 (June 29, 1998).  Several manufacturers discussed 340B rebate models with HRSA long before August 2025, *Eli Lilly & Co.*, 2025 WL 1423630, at *6 (describing a months-long back-and-forth with manufacturers).  HRSA has claimed authority to approve or disapprove of any specific rebate proposal and said it needed more information before it could do so.  *Id.* at *8; *Johnson & Johnson Health Care Sys. Inc. v. Kennedy*, 2025 WL 1783901, at *3-4 (D.D.C. June 27, 2025).  The Pilot Program does not contradict that position.

Plaintiffs claim that HRSA "stopped drug companies from enacting similar [rebate] programs" as recently as last year, ECF 3 at 1, but that is wrong.  In the cited action, HRSA took the position that it was not approving particular proposals *yet*.[8]  Further, the rebate policies at issue in those prior actions included proposals seeking to implement 340B rebates for *all* 340B drug transactions.  *Eli Lilly & Co.*, 2025 WL 1423630, at *6.  The Pilot Program, by contrast, implements 340B rebates for a very limited number of DPNP-selected drugs.  Any suggestion that the Pilot Program is an agency about-face is false.

Plaintiffs are also wrong about the legal doctrine applicable to an agency's change in position.  They claim that "when an agency reverses its prior policies, as here, … the APA requires 'more detailed justification than what would suffice for a new policy created on a blank slate.'"  ECF 3 at 9-10 (quoting *FCC v. Fox Television Studios*, 556 U.S. 502, 515 (2009)).  But in *Fox*, the Supreme Court held that an agency generally "need *not* demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one," and that "the agency

---

[8] ECF 1, ¶¶ 40-51; ECF 10-1; ECF 10-4; ECF 10-5.

need **not** always provide a more detailed justification than what would suffice for a new policy created on a blank slate." 556 U.S. at 515 (some emphasis added). Even if HRSA changed its mind (it did not), the question is simply whether it "display[ed] awareness that it **is** changing [its] position" and offered "good reasons for the new policy." *Id.* Here, the agency satisfied that standard. HRSA acknowledged that the Pilot Program would take 340B pricing mechanisms in a different direction. *See* 90 Fed. Reg. at 36,163-64 (noting that rebates may "shift how the 340B Program has operated"). And it offered good reasons for testing rebates. The DPNP created an urgent problem that a 340B rebate model would address, and broader rebate-model talks were ongoing, so a pilot program would help all parties "better understand the merits and shortcomings of the rebate model" and would inform "consideration[s] of any future 340B rebate models." *Id.* at 36,164.

HRSA was likewise "cognizant that longstanding policies may have engendered serious reliance interests." *White Lion*, 604 U.S. at 570 (cleaned up). Indeed, HRSA considered Plaintiffs' asserted reliance in choosing to test rebates on a limited set of 340B drugs, with agency-approved plans and guidelines, rather than to endorse rebates outright.[9] Nor can Plaintiffs' reliance interests trap HHS's policy in amber when Congress has expressly authorized rebates, *see* 42 U.S.C. § 256b(a)(1), and has created a **new** statutory problem that rebates solve, *id.* § 1320f-2(d).

## B.      HRSA Was Not Required To Respond To Comments.

Plaintiffs make much of the fact that HHS did not respond to the approximately 1,000 comments submitted about the Pilot Program.[10] But they fail to explain why any response was

---

[9]  90 Fed. Reg. at 36,164 ("OPA is introducing this pilot program to test the rebate model on a select group of drugs … in a methodical and thoughtful approach to ensure a fair and transparent 340B rebate model process for all stakeholders involved.").

[10]  Many of the comments Plaintiffs invoke consisted of the same letter sent numerous times. One entity even submitted the exact same letter at least 165 times, accounting for roughly 15% of all comments. ECF 36-2, ¶ 31.

necessary. Indeed, Plaintiffs never quite say whether they challenge the August 1 Notice or HRSA's acceptance of Intervenors' rebate proposals, but neither action required notice and comment. The APA distinguishes legislative rules (made through rulemaking) from orders (made through adjudication). *See* 5 U.S.C. § 551(4)–(7). Legislative rules generally require notice and comment. *Id.* § 553. Orders merely interpreting a statutory mandate do not. *Blanca Telephone Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014).

If Plaintiffs are challenging the August 1 Notice that announced the Pilot Program, they do not contend that it is a "legislative rule" subject to notice and comment. The Notice was a non-binding policy statement with no standalone legal effect. *See* 90 Fed. Reg. at 36,164. Given that status, HRSA was not required to solicit comments on the Notice in the first place, and therefore was not subject to any APA obligation to publish responses to such comments. *See City of Portland v. EPA*, 507 F.3d 706, 714-15 (D.C. Cir. 2007) (observing that "whether EPA adequately responded to these comments makes no difference because the Agency had no obligation to respond to them in the first place"). In any event, the Pilot Program will ***generate*** the very information Plaintiffs seek. As HRSA explained, by participating in the Pilot Program HRSA and industry stakeholders will gain valuable experience and information on the operational benefits and downsides of rebates. 90 Fed. Reg. at 36,163-64.

If Plaintiffs are challenging the approvals of manufacturers' individual Pilot Program applications, those are adjudicatory "orders" implementing the IRA's pricing scheme that are not subject to the APA's notice-and-comment requirements, and they are voluntary ones at that. The agency "adjudicate[d] [] facts in particular cases," namely whether a specific drug manufacturer's proposed model was adequate for participation in the Pilot Program. *See, e.g.*, *Franks v. Salazar*, 816 F. Supp. 2d 49, 59 (D.D.C. 2011). The application-and-approval process underscores the time-

limited and narrow nature of the Pilot Program.  Plaintiffs supply no authority supporting the claim that HRSA was required to publish responses to public comments before completing those adjudications.  Nor do Plaintiffs identify unanswered questions about the proposed rebate models. HRSA explained that the approved "plans all met the requirements as stated in the" August 1 Notice.[11]  Nothing more would be required under the APA.  *See Hudson v. FAA*, 192 F.3d 1031, 1034, 1036 (D.C. Cir. 1999); *see also Housatonic River Initiative v. EPA*, 75 F.4th 248, 266-67 (1st Cir. 2023).

###    C.    A Cost-Benefit Analysis Supports The Pilot Program.

Plaintiffs next challenge HRSA's cost-benefit analysis by grossly inflating their projected costs while entirely ignoring manufacturers' far greater costs if the Pilot Program does not go into effect.  Plaintiffs dispute HRSA's estimate of a $200 million annual burden for covered entities, arguing that this figure "grossly understates the true cost."  ECF 3 at 13.  They put the number closer to $400 million and argue that HHS failed to properly account for the Pilot Program's administrative costs.  *Id.* at 13-14, 17.  That estimate is implausible, as the Pilot Program runs on a software, Beacon, that "precisely mirrors" a software that covered entities (including some of Plaintiffs here) have used for years.  Ex. 1, ¶ 8.  Even crediting Plaintiffs' inflated and unsubstantiated $400 million estimate, that figure is dwarfed by the ***over $4 billion*** in duplicate discounts manufacturers will provide in 2026 alone absent the Pilot Program.  *See* ECF 36-1, ¶ 18, ECF 39-1, ¶ 25, ECF 45-1, ¶ 18, ECF 50-4, ¶ 40.[12]  This disparity becomes even starker when accounting for the substantial civil monetary penalties—potentially millions of dollars per day— that manufacturers face for failing to satisfy their DPNP obligations.  42 U.S.C. §§ 1320f-6(c),

---

[11]  HRSA, *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program.

[12]  BRG, *CMS October 2024 Final Guidance for MFP Effectuation in 2026-2027:  Implications for Duplication with the 340B Channel*, https://tinyurl.com/kt6nzhak.

1320f-2(a)(5). Moreover, in the context of the 340B Program as a whole, Plaintiffs' alleged costs constitute a de minimis fraction of the tens of billions of dollars in 340B discounts covered entities receive.[13] The purported $400 million burden would be distributed across more than 60,000 covered entities nationwide,[14] whereas only nine manufacturers would bear over $4 billion in losses.

Plaintiffs contend that HRSA failed to "identify benefits [of the Pilot Program] that bear a rational relationship to the … costs imposed," and therefore that "no such analysis happened for *any* of the significant costs inherent to the Rebate Program." ECF 3 at 13 (internal quotation marks omitted). This too is false. In its Pilot Program announcement, HHS cited the elimination of duplicate discounts under the 340B Program and DPNP as the driving force behind effectuating the 340B price through a rebate. 90 Fed. Reg. at 36,163. Preventing illegal duplicate discounts is an obvious benefit that bears a rational relationship to any costs imposed—even if Plaintiffs disagree. Plaintiffs therefore do not demonstrate a likelihood of success on the merits by alleging that HRSA arbitrarily ignored the Pilot Program's costs and benefits.[15]

### D.    Plaintiffs Cannot Show HRSA Had Viable Alternatives To Consider.

Plaintiffs erroneously contend that HRSA never considered alternatives to a rebate model or the Pilot Program. They first vaguely claim that "IRA/340B deduplication could be done via a

---

[13] *See* U.S. Senate Committee on Health, Education, Labor & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (April 4, 2025) at 2, https://tinyurl.com/2rey6ybw ("Cassidy Senate Report") (noting that in 2023, covered entities received $124 billion in drugs (at wholesale acquisition cost), yet paid only $66 billion); HRSA, *2024 340B Covered Entity Purchases*, https://tinyurl.com/6jbbhynf (noting even greater numbers for 2024).

[14] *See* HRSA, Search Covered Entities, https://340bopais.hrsa.gov/SearchCe (displaying 63,740 active covered entities) (last visited Dec. 6, 2025).

[15] Although Plaintiffs briefly reference substantive unreasonableness, their motion includes no argument under Count IV of their Complaint as a basis for emergency relief. *See* ECF 3 at 2. Even if this claim were properly before the Court, courts review substantive unreasonableness deferentially. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). They "simply ensure[] that the agency has acted within a zone of reasonableness." *Id.* As demonstrated above, the Pilot Program is within that zone, and Plaintiffs provide no basis for concluding otherwise.

government-backed 'clearinghouse' to exchange information between covered entities and drug companies." ECF 3 at 15. This is a smokescreen. Plaintiffs do not demonstrate that such a clearinghouse could be created and implemented before the MFP goes into effect on January 1. *Id.*; ECF 1, ¶¶ 88, 154. Indeed, the earliest any such clearinghouse allegedly could be available (on a voluntary basis and for testing only) is the ***fall*** of 2026—well after drug manufacturers must confront their new deduplication obligations under the 340B Program and DPNP. ECF 36-2, ¶ 10. And even then, data will not be available to manufacturers and will not enable timely 340B-MFP deduplication. *Id.* Because the clearinghouse will not be operational before January 1, it is not a viable alternative that HRSA needed to consider. *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("[A]n agency must consider only significant and viable and obvious alternatives." (cleaned up)).

Plaintiffs next contend HRSA could have given the Pilot Program a more limited scope. ECF 3 at 16. But the Pilot Program *is* limited in scope—just not in the ways Plaintiffs would prefer. The Pilot Program applies to only a limited number of 340B drugs that will ***already*** be receiving steep discounts under the IRA. There is hardly a "swath" of drugs at issue as Plaintiffs insist, ECF 1, ¶ 5, and it is difficult to imagine that a pilot program involving "a smaller subset of drugs" would be effective, ECF 3 at 16. HRSA could not have limited the Pilot Program to fewer drugs selected for the DPNP without defeating the program's central purpose: facilitating 340B-MFP deduplication. Nor could HRSA rationally have implemented a pilot program exempting some covered entities. ECF 3 at 16. A pilot program with that limitation would not meet HRSA's stated 340B-MFP deduplication goal, rendering it self-defeating. *See Nat'l Shooting Sports Found.*, 716 F.3d at 215.

Finally, although Plaintiffs assert that HRSA "ignored every possible alternative proposed"

and that "the outcome was predetermined" because HRSA did not explicitly or publicly weigh them against the Pilot Program, ECF 3 at 16, HRSA "need not consider every alternative proposed nor respond to every comment made." *Nat'l Shooting Sports Found.*, 716 F.3d at 215; *see also Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir.1984) (providing that an agency was not required to "respond to every comment, or [] analyze every issue or alternative raised by the comments, no matter how insubstantial"). This is particularly so where, as here, the proposed alternatives are not viable because they do not address the central concern that motivated the agency's proposal in the first place. *See Nat'l Shooting Sports Found.*, 716 F.3d at 215.

## II.    THE EQUITABLE FACTORS FAVOR INTERVENORS.

### A.    An Injunction Will Irreparably Harm Intervenors.

Within three weeks, on January 1, Intervenors will find their drugs subject to competing 340B and DPNP discounts without a clear way to identify the right price. Absent the ability to implement their HRSA-approved rebate models, manufacturers will inevitably provide duplicate discounts totaling over $4 billion. ECF 36-1, ¶¶ 13, 18. That figure does not account for the substantial penalties—potentially millions per day—for which the IRA provides. *Id.* ¶ 13. No viable alternative exists that Intervenors could implement in the little time remaining before their statutory obligations commence. As explained above, Plaintiffs' purported alternatives are neither feasible before January 1, nor capable of enabling manufacturers to satisfy their DPNP obligations, even if they were available. Enjoining the Pilot Program would therefore inflict irreparable harm on Intervenors—who have no burden to establish such harm in the first place—by forcing them to provide billions of dollars in duplicate discounts inconsistent with the IRA.

### B.    Plaintiffs Will Not Suffer Any Harm Absent Emergency Relief.

Plaintiffs cannot demonstrate that the Pilot Program will harm them. Covered entities sell manufacturers' drugs at regular prices then replenish their stocks at deeply discounted 340B prices.

And covered entities will receive the ***same*** 340B price under the Pilot Program as they do now.  If they think manufacturers are not providing the 340B price when it is required, the 340B statute provides remedies.  *See* 42 U.S.C. § 256b(d)(3)(A); 42 C.F.R. § 10.21(a).  Any administrative burden they might incur while going through necessary deduplication procedures is driven by statutory requirements and dwarfed by the windfall they receive under the relevant statutes.

Plaintiffs cite no decision from this District or the First Circuit holding that their (exaggerated) administrative costs justify the emergency relief sought.  Plaintiffs rely only on a stay opinion from a Fifth Circuit motions panel (which, they fail to note, was later vacated by a merits panel that was itself vindicated by the Supreme Court).  ECF 3 at 17; *see Wages & White Lion Invs., LLC v. U.S. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), *stay vacated*, 41 F.4th 427 (5th Cir. 2022), *rev'd*, 90 F.4th 357 (5th Cir. 2024) (en banc), *rev'd*, 604 U.S. 542 (2025).

Plaintiffs also misattribute their costs to the Pilot Program.  Any administrative costs associated with collecting and providing claims data are unavoidable.  The deduplication problem arises from the IRA and thus ***must*** be solved—which the agency itself has acknowledged, while declining to take on the deduplication burden.  *See* 42 U.S.C. § 1320f-2(d); 2026 Guidance at 54-55, 230-32.  The only feasible and accurate solution is the use of claims data.  *See* 90 Fed. Reg. at 36,165.  In other words, Plaintiffs will ultimately have to share claims data with ***someone***—be it the manufacturers or the government.  Indeed, collecting and providing claims data is not a new obligation.  Plaintiffs are already obligated by the 340B statute to maintain auditable records "sufficient to demonstrate continued compliance with 340B requirements," *i.e.*, claims data. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463 (D.C. Cir. 2024) (quoting 75 Fed. Reg. 10,272, 10,274 (March 5, 2010)).  Additionally, the 340B statute ***already permits*** manufacturers to condition 340B sales on the provision of claims data—whether they use a rebate model or not.

*See id.* at 460-64; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-06 (3d Cir. 2023); *Johnson & Johnson*, 2025 WL 1783901, at *15. In this way, too, Plaintiffs' objections to providing claims data are hardly traceable to the Pilot Program.

Manufacturers have also streamlined this process. Most covered entities routinely collect and transmit claims data to their third-party administrators ("TPAs") who use such data to facilitate 340B-priced purchasing on their behalf. Manufacturers are providing free-to-covered entities software, Beacon, which "precisely mirrors" the software that covered entities and their TPAs already use for 340B purchasing. Ex. 1, ¶¶ 7–8; *see also* 90 Fed. Reg. at 36,164 (requiring that "all costs for data submission through an Information Technology (IT) platform be borne by the manufacturer …."). Covered entities (or their TPAs) can use that same underlying claims data for submission to Beacon for the Pilot Program. Ex. 1, ¶¶ 7–8. Providing standard claims data for the Pilot Program's limited number of drugs to the same vendor is thus unlikely to burden covered entities with significant additional costs. If, as Plaintiffs say, covered entities hire new personnel, *see* ECF 3 at 14, that is an inefficiency they choose to undertake. The Pilot Program simply relies on a process many covered entities are already using—providing claims data to substantiate claims—and will not impose any undue administrative burdens on covered entities.

Plaintiffs claim irreparable harm from the time gap between dispensation and receipt of rebates—which they disingenuously characterize as "interest-free loans" from covered entities to drug manufacturers—but such problems are overstated and of Plaintiffs' own making. ECF 3 at 3, 20. The Pilot Program may actually ***improve*** Plaintiffs' payment terms and many covered entities will not have to make the initial full-priced outlay at all. Rebates in the Pilot Program are due within ten days of validated claims submissions, whereas covered entities' payments to wholesalers are typically not due for thirty days. *See* 90 Fed. Reg. at 36,164–65 (stating that

manufacturers will be expelled for failure to promptly pay rebates). So covered entities that promptly validate their claims should receive rebates before payment is due. ECF 36-2, ¶ 23. Financing costs for covered entities, if any, should either be improved or at most be negligible.[16]

If there are cash-flow disruptions, that is a result of Plaintiffs' preferred inventory system. Covered entities almost exclusively choose to operate on an inventory management system called the "replenishment model," through which a covered entity dispenses drugs, charges its patients the full price, and, after a sufficient number of 340B-eligible dispenses occur, places an order for replenishment drugs at a discount (essentially a rebate-in-kind). ECF 36-2, ¶ 24. Waiting for the requisite number of dispenses before submitting claims lengthens the payment lag about which Plaintiffs complain. But even under the replenishment model, if covered entities or their TPAs promptly submit claims data, covered entities would receive rebates before payment is due. *Id.*

### C.    The Balance of Equities And The Public Interest Favor Intervenors.

The equities favor Intervenors. The affected manufacturers stand to lose more than $4 billion next year in duplicate discounts, plus substantial civil monetary penalties. Covered entities across the country allegedly stand to lose a fraction of that, if anything at all. And denying Plaintiffs' motion will mean only that Plaintiffs are required to transmit data they already collect and provide in the same manner. Plaintiffs should not be rewarded with the extraordinary relief of a temporary restraining order for bringing their long-running (and unsuccessful) challenges of 340B rebate models to a new forum.

Nor is the public interest served by blocking lawful agency actions that are necessary for congressional commands to be executed. *See NCTA – Internet & Television Ass'n v. Frey*, 2020

---

[16] IQVIA, *How Will a Rebate Model Impact Cash Flow in the 340B Drug Pricing Program?* (Aug. 27, 2025) at 1, https://tinyurl.com/58v5sjf6 ("[F]inancing costs under the 340B rebate model are small and unlikely to be a barrier to its use by covered entities.").

WL 2529359, at *3 (D. Me. May 18, 2020). That is especially true here, where the agency is testing a policy designed to address an urgent problem, the agency action at issue was published four months prior to the filing of this litigation, and Plaintiffs sought emergency relief a month before Intervenors begin to face debilitating statutory penalties and enormous duplicate discounts. Moreover, because covered entities typically do not use windfalls from federal statutory discounts to pass savings on to patients,[17] the public has no interest in allowing covered entities to reap massive duplicate discounts from manufacturers. Here, the public is best served by preventing abuse of federal drug-pricing discount programs. The Court will not serve the public interest by enjoining the Pilot Program while it adjudicates Plaintiffs' meritless claims.

**D.    Plaintiffs' Motion For Emergency Relief Is Untimely And Unreasonable.**

Plaintiffs employ a sleight-of-hand about what agency action is at issue. An APA lawsuit must challenge a final agency action. *Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 82 (1st Cir. 2016). But Plaintiffs studiously avoid identifying *which* agency action they challenge: the August 1 announcement of the Pilot Program, or HRSA's subsequent individualized adjudications approving Intervenors' specific rebate proposals?

The gravamen of Plaintiffs' motion is that HRSA's decision to hold a rebate pilot program was not reasonably explained. The agency's decision to hold the Pilot Program was announced in the August 1 Notice, yet Plaintiffs waited until December to file suit—less than a month before Intervenors' penalty-backed statutory obligation to deduplicate MFP and 340B discounts kicks in—and seek emergency relief. Plaintiffs offer no justification for the months-long delay.

---

[17] *E.g.*, *AbbVie Inc. v. Drummond*, -- F. Supp. 3d --, 2025 WL 3048929, at *9 (W.D. Okla. Oct. 31, 2025); Cassidy Senate Report, *supra*; U.S. Government Accountability Office, *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* (June 21, 2018), https://tinyurl.com/25dnnbfs; U.S. Government Accountability Office, *Manufacturer Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement* (Sept. 23, 2011), https://tinyurl.com/8m83dzm8; U.S. Department of Health and Human Services, Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program* (Feb. 4, 2014), https://tinyurl.com/56s6p7w7.

Plaintiffs' untimely motion should be denied for that reason alone. *See We the People PAC v. Bellows*, 512 F. Supp. 3d 74, 97 (D. Me. 2021) (Woodcock, J.) (rejecting emergency relief request where "Plaintiffs have provided no reason why they waited until now to request" such relief).

Nor do Plaintiffs explain why, even assuming HRSA should have provided additional explanation, the appropriate remedy would be a ***multi-billion dollar injunction*** rather than a remand for supplemental reasoning. *Central Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) ("A reviewing court that perceives flaws in an agency's explanation is not required automatically to set aside the inadequately explained order."); *see also Town of Weymouth v. Mass. Dep't of Env't Prot.*, 973 F.3d 143, 146 (1st Cir. 2020).

## CONCLUSION

Plaintiffs' motion for emergency relief should be denied.

Dated:  December 15, 2025

Respectfully submitted,

Jay S. Geller
Law Office of Jay S. Geller
Lunt Professional Building
74 Lunt Road, Suite 206
Falmouth, ME 04105
Telephone: (207) 899-1477
Email: jgeller@jaysgellerlaw.com

*/s/ Matthew S. Owen*
Matthew S. Owen (admitted *pro hac vice*)
Meredith M. Pohl (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Email: matt.owen@kirkland.com
        meredith.pohl@kirkland.com

*Counsel for AbbVie Inc. and Pharmacyclics LLC*

Allon Kedem*
Jeffrey L. Handwerker*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
(202) 942-5999 - fax
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com

*/s/ Jeffrey D. Talbert*
Jeffrey D. Talbert
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
jeff.talbert@arnoldporter.com

*Attorneys for AstraZeneca Pharmaceuticals LP*
*\* Pro hac vice*

Kevin F. King (admitted *pro hac vice*)
Thomas Brugato (admitted *pro hac vice*)
Daniel G. Randolph (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 10th Street NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
kking@cov.com
tbrugato@cov.com
drandolph@cov.com

*/s/ Alfred C. Frawley, IV*
Alfred C. Frawley IV (Maine Bar No. 004854)
MCCLOSKEY, MINA, CUNNIFF & FRAWLEY, LLC
12 City Center
Portland, ME 04101
Tel: (207) 772-6805
Fax: (207) 879-9374
afrawley@lawmmc.com

*Counsel for Boehringer Ingelheim Pharmaceuticals, Inc. and Novo Nordisk Inc.*

Kwaku A. Akowuah (admitted *pro hac vice*)
Madeleine Joseph (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Email: kakowuah@sidley.com

*/s/ Daniel L. Rosenthal*
Daniel L. Rosenthal, Bar #8618
MARCUS | CLEGG
16 Middle Street, Unit 501
Portland, ME 04101
(207) 828-8000
dlr@marcusclegg.com

Meenakshi Datta (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Email: mdatta@sidley.com

*Counsel for PhRMA*