IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

THE AMERICAN HOSPITAL ASSOCIATION, *et al.*,

                Plaintiffs,

v.

ROBERT F. KENNEDY, JR. SECRETARY of the U.S. Department of Health and Human Services, *et al.*,

                Defendants.

No. 2:25-cv-600-JAW

**DECLARATION OF CHANTELLE BRITTON**

I, Chantelle Britton, M.P.A., M.S., declare as follows pursuant to 28 U.S.C. § 1746:

    1.    I am the Director of the Office of Pharmacy Affairs (OPA). OPA is part of the Health Resources and Services Administration (HRSA), an agency within the U.S. Department of Health and Human Services (HHS). OPA has delegated authority to administer the 340B Program, which is codified in statute at 42 U.S.C. § 256b or Section 340B of the Public Health Service Act. OPA is responsible for the day-to-day administration of the 340B Program. I make this declaration based on personal knowledge and information provided to me by my staff in the course of my official duties as the Director of OPA.

    2.    Pursuant to 42 U.S.C. § 256b(a)(1), "[t]he Secretary [of HHS] shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (*taking into account any rebate or discount, as provided by the Secretary*) to the manufacturer for covered outpatient drugs . . . does not exceed" the statutorily-defined ceiling price (emphasis added). This provision, which has been in the statute since the 340B Program's inception in 1992, has been interpreted by HHS as providing the legal authority for effectuating the 340B ceiling price by either a rebate or discount mechanism.

- 1 -

3.      Notwithstanding that statutory authority to operationalize rebates and set conditions for rebates in the 340B Program,[1] covered entities have historically purchased covered outpatient drugs in the 340B Program at upfront discounted prices rather than through back-end rebates, with few exceptions.

4.      After receiving a significant amount of feedback from (or on behalf of) manufacturers and covered entities regarding implementation of rebate models, OPA recently became interested in testing the merits and shortcomings of a rebate model, including whether it was beneficial in addressing 340B and Maximum Fair Price (MFP)[2] deduplication and the prevention of 340B Medicaid duplicate discounts and diversion. For the past several years, drug manufacturers have been aggressively pursuing the unilateral implementation of widespread 340B rebate models, insisting that a rebate model would have minimal impact on covered entities and patients and is necessary to address a wide variety of perceived program integrity concerns. Covered entities have argued just as hard in opposition to rebate models, asserting that a rebate model would adversely impact covered entities cash flow, negatively impact patients' access to drugs and services and that manufacturers' program integrity concerns are overblown. Given these hyperbolic positions, OPA felt it necessary to test rebates to see how the mechanism would impact the 340B Program and its stakeholders. The purpose of the rebate Pilot Program was also to help OPA consider any future 340B rebate models consistent with the 340B statute and the Administration's goals.

---

[1] *See* 42 U.S.C. § 256b(a)(1); *see also Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630 (D.D.C. May 15, 2025), *appeal filed*, No. 25-5221 (D.C. Cir. June 13, 2025); *Johnson & Johnson Healthcare Sys. Inc. v. Kennedy*, 2025 WL 1783901 (D.D.C. June 27, 2025), *appeal filed*, No. 25-5236 (D.C. Cir. June 30, 2025).

[2] Maximum Fair Price refers to the negotiated price under the Medicare Drug Price Negotiation Program (MDPNP). *See* 42 U.S.C. §§ 1320f(c)(2). Under the MDPNP "nonduplication" provision, manufacturers that agree to a Maximum Fair Price are not required to provide a covered entity access to the negotiated Maximum Fair Price under that agreement if the drug is also subject to a 340B agreement and the 340B ceiling price is lower than the Maximum Fair Price. 42 U.S.C. § 1320f-2(d). Deduplication refers to the process a manufacturer uses to assess its obligation to provide access to the Maximum Fair Price under the MDPNP nonduplication provision.

5. OPA recognized that a rebate model would be a significant shift from how the 340B program has been operating, so it sought to test the rebate model on a small scale to help it better understand the merits and shortcomings of a rebate model from stakeholders' perspectives while minimizing disruption to covered entities. It therefore limited the scope of the Pilot Program to the manufacturers with Medicare Drug Price Negotiation Program (MDPNP) Agreements with the Centers for Medicare & Medicaid Services (CMS) for the ten selected drugs for initial price applicability year 2026, in order to test the viability of rebates as an option for effectuating 340B ceiling prices.

6. Limiting the scope of the Pilot Program to the manufacturers of the ten drugs on the MDPNP Selected Drug List for 2026 was intended to allow OPA to better understand the merits and shortcomings of the rebate model from stakeholders' perspectives, including those of manufacturers seeking to address 340B and MFP deduplication.

7. On August 1, 2025, OPA published in the Federal Register a notice titled "340B Program Notice: Application Process for the 340B Rebate Model Pilot Program." 90 Fed. Reg. 36,163 (Aug. 1, 2025).

8. The notice announced the availability of a 340B Rebate Model Pilot Program as a voluntary mechanism for qualifying drug manufacturers to effectuate the 340B ceiling price through a rebate rather than upfront discount on select drugs to all covered entities, and to collect comments on the structure and application process of the Pilot. The notice also contained the criteria for manufacturers' plans to implement a rebate model and set out expectations for continued participation in the Pilot.

9. A technical correction to the notice was published on August 7, 2025, which extended the 30-day comment period by a week to September 8, 2025. 90 Fed. Reg. 38,165 (Aug. 7, 2025).

10. Applications were due on September 15, 2025, the week following the deadline for the submission of comments.

11.    In response to the notice, OPA received more than 1,100 comments and applications from each of the nine manufacturers that were eligible to participate in the Pilot.

12.    OPA reviewed the comments and considered suggestions and concerns raised therein when evaluating the applications.

13.    Each of the nine plans for implementation of rebate models in connection with the Pilot Program submitted by the manufacturers addressed general requirements, reporting requirements, and criteria pertaining to rebates and data. OPA carefully reviewed each plan and sought revisions and clarifications on a number of topics having to do with claims submission, billing, rebate calculation, and inventory management before deciding whether to approve the plans.

14.    As further explained below, OPA carefully balanced the equities and took into consideration a variety of factors, including impacts on covered entities and concerns raised in comments, in making decisions on which specific aspects of the plans that it would approve.

### *The January 1, 2026 Effective Date*

15.    The August 1, 2025 notice announced that approved manufacturer plans would take effect on January 1, 2026.

16.    The January 1 effective date was chosen to align with the effective date of the first set of negotiated prices under the MDPNP, which are set to take effect on January 1, 2026. Starting January 1, manufacturers participating in MDPNP will be implementing 340B prices and Maximum Fair Price deduplication. A 340B rebate mechanism is one way that drug manufacturers can deduplicate 340B prices and Maximum Fair Price. Many drug manufacturers participating in the MDPNP stated that a 340B rebate mechanism is their preferred method to achieve deduplication.

17.    At least as far back as 2024, it was widely known that OPA was considering requests from multiple drug manufacturers to implement rebate models. OPA determined that the five-month lead-time from the announcement of the Pilot to effective date was sufficient for covered entities to prepare for implementation of the Pilot, particularly given the limited scope of the Pilot.

4

18. OPA also required plans to allow for 60 calendar days' notice to covered entities and other impacted stakeholders before implementation of a rebate model, with instructions for registering for any IT platforms. Sixty days was more than sufficient time for covered entities to prepare for the Pilot given that the Pilot was limited in scope, the pharmacy and medical claims information being collected was limited to information that most covered entities already collect, and the Pilot was structured to use existing 340B purchasing accounts.

19. Although the notice stated that OPA's approvals of manufacturer plans would be made by October 15, 2025, the lapse in appropriations applicable to some components of HHS prevented OPA from meeting that goal. Instead, OPA announced eight manufacturers that were approved to participate in the Pilot on October 30, 2025 for a January 1, 2026 effective date. The ninth manufacturer was later approved by OPA to participate in the Pilot beginning on April 1, 2026, even though this manufacturer advised OPA that a January 1 effective date for its participation in the Pilot Program was preferred for its alignment with the effective date of the MFP for its selected drug under the MDPNP.

*Alternatives to a Rebate Pilot*

20. While alternatives to the Pilot were raised by commenters, OPA did not adjust the concept for its Pilot after considering these comments. Many commenters proposed alternatives that would have maintained the status quo of effectuating ceiling prices through upfront discounts or were otherwise counter to the central aim of the Pilot, which was to test whether rebates were feasible across other covered entity types besides AIDS Drug Assistance Programs. Some suggested alternatives were clearly outside the scope of OPA's legal authority or relied on questionable legal authority.

21. For example, commenters proposed OPA create a government-backed, third-party "clearinghouse" to collect data from drug manufacturers and covered entities, to deduplicate 340B prices and Maximum Fair Price under the MDPNP, and to address manufacturers' program integrity

5

concerns with the 340B program. Commenters asserted that examples of these "clearinghouses" already exist, such as the Medicare Transaction Facilitator, which facilitates manufacturer effectuation of Maximum Fair Price for drugs selected for negotiation under the MDPNP. OPA rejected those suggestions because those methodologies do not test the concept of a rebate, and testing the rebate methodology to effectuate the 340B ceiling price was OPA's chief aim. Moreover, there is no clear legal authority in the 340B statute for OPA to create the type of clearinghouses suggested by the commenters.

### *The Scope of the Pilot Program*

22. OPA also rejected proposals to further limit the scope of the Pilot Program. The Pilot, which encompasses only the selected drugs of the manufacturers in the MDPNP for IPAY 2026, was narrowly tailored by design. The ten drugs that are in the Pilot Program represent ten Labeler Codes and 83 National Drug Codes (NDCs) of the 904 active Labeler Codes and 47,541 NDCs in the 340B Program. Sales in the 340B Program in 2024 totaled $81.4B. The ten drugs that are subject to the Pilot Program account for only 2% of that total. Further, of the drugs in the Pilot Program, only one, Stelara, was in the top 20 of 340B drug products purchased by covered entities in 2024.

23. Commenters suggested further restricting the number of drugs in the Pilot. OPA rejected that suggestion because reducing the number of drugs in the Pilot would interfere with one of the Pilot's goals of addressing manufacturer concerns regarding 340B-MFP deduplication. Under the MDPNP, manufacturers that agree to a Maximum Fair Price are not required to provide a covered entity access to the negotiated Maximum Fair Price under that agreement if the drug is also subject to a 340B agreement and the 340B ceiling price is lower than the Maximum Fair Price. 340B-MFP deduplication refers to the process of preventing duplicate discounts. Since the drugs with MFPs in effect under the MDPNP for CY 2026 are the only drugs eligible for the Pilot, further limiting the number of drugs would have not afforded a 340B rebate option for each of the ten drugs for which manufacturers are seeking deduplication. Reducing the number of drugs included would also interfere

6

with the agency's ability to collect sufficient information on which to evaluate the viability of a broader rebate model.

24. Commenters suggested that manufacturers' rebate proposals should be limited to only a subset of covered entities or to only covered entities that volunteered to participate. OPA rejected this suggestion. The 340B Program contains a wide variety of covered entity types, ranging from federally qualified health centers, certain children's hospitals and free-standing cancer hospitals, critical access hospitals, rural referral centers, black lung clinics, and other federally funded health care entities. 42 U.S.C. § 256b(a)(4). Because another important goal of the Pilot is to collect information on the experience of a wide variety of covered entity types with the rebate model, OPA decided that manufacturers should be able to structure their rebate programs for as broad a variety of covered entities as manufacturers deemed necessary to appropriately test the model.

25. The scope of the Pilot is already extremely limited because only ten drugs are included. Further limiting its scope would undermine the agency's goal of information gathering.

### *Drug Costs*

26. Several covered entity commenters indicated that the Pilot would have a significant financial impact because it would require covered entities to "float" billions of dollars to drug manufacturers. They contended that this would occur because 340B purchases would be made at the higher wholesale acquisition cost (WAC) price and they would only be made whole later when the rebate was paid, which OPA required to be paid within ten calendar days of submission. In contrast, drug manufacturers asserted that given the short ten-day time frame for processing claims, the financial impact would be minimized as it was likely that covered entities would receive rebate payments before payment would be due by the covered entity to the wholesaler for most purchases. Several drug manufacturers also requested a longer time frame for processing claims with some wanting OPA to extend the ten days to fourteen days.

27. Given the wide variety of assertions on this topic, OPA opted for the shorter payment window, in part, to address covered entity concerns regarding cash flow and determined that it would be necessary to collect data from the Pilot to make an informed decision about any necessary future changes. OPA was of the view that the impact on covered entities would be lessened by maintaining the shorter ten-day time frame for processing claims and by the extremely limited scope of the Pilot.

28. Moreover, most drugs included in the Pilot would not "sit on the shelf for long[] periods of time before being dispensed" as Plaintiffs claim. Compl. ¶ 85. Rather, the majority of drugs included in the Pilot are dispensed as a full package size (i.e., dispensed as one prescription), which minimizes, or altogether eliminates, the necessity to wait long periods of time between ordering a package and submitting a rebate request.

29. Any financial strain on covered entities will be further mitigated by the fact that manufacturers will pay unit-level rebates rather than package-level rebates. Said another way, for purchases from which multiple dispenses will be drawn, covered entities will not have to wait to dispense an entire package before being able to request a rebate; instead, if applicable, they may do so after the first dispense from the package (e.g., a rebate may be requested for 30 tablets dispensed out of a bottle of 100 tablets).

30. OPA acknowledges that adopting the rebate mechanism for even this limited set of drugs will be a significant change for covered entities. However, covered entities derive substantial financial benefits from the 340B spread, which is additional revenue representing the difference between the cost of a drug and what a covered entity is reimbursed by a third-party payer—e.g., covered entities turn a profit when serving insured patients because insurance companies reimburse them at full price for drugs that they bought at the 340B discount. A ten-day lag before a covered entity is made whole, on balance, does not strike OPA as being as calamitous as covered entities portray, particularly if, as manufacturer commenters state, the rebate in most instances will be paid before the purchase invoice from a wholesaler for the WAC amount is due. The Pilot will allow OPA

to collect data to evaluate whether rebates are paid before a purchase invoice is due and to evaluate more generally the impact of rebates on covered entities.

31. Commenters were also concerned about delays in receiving rebates, as well as disputed claims and improperly denied claims. OPA has provided a number of guardrails to mitigate these concerns. These include, but are not limited to: 1) severely limiting the bases for the denial of claims; 2) requiring manufacturers to provide a rationale and specific documentation for any claim denials; 3) requiring manufacturers to have processes in place for the good faith resolution of disputes; and 4) requiring manufacturers to report to OPA information related to claim delays and denials.

32. In addition, OPA is planning to create a mechanism through which covered entities will be able to report to OPA when the covered entity is unable to secure a rebate and covered entities will be able to raise these types of issues through the 340B Administrative Dispute Resolution process. Given that these safeguards provide covered entities with protections that exceed the protections that covered entities maintain outside of the Pilot, OPA determined that the dispute process was sufficient and that the suggestions from commenters to address alleged unaccounted-for costs caused by perceived gaps in the dispute resolution system were unnecessary.

33. Finally, OPA recognized that covered entities could be due partial credit for 340B purchases made under the upfront discount system when covered entities transition to a rebate mechanism. Under the current upfront discount system, covered entities cannot claim the 340B price until they have dispensed a full package size. For example, if the package size for a given drug is 100 pills, if a covered entity has only dispensed 25 pills to one patient, the covered entity must wait until it dispenses the rest of the 75 pills to other patients before claiming the 340B discount. In this example, a covered entity can't claim the 340B price until it has "accumulated" the full package size by providing all 100 pills to 340B eligible patients. OPA worked with manufacturers to ensure that there was a mechanism for covered entities to obtain the 340B price for any drugs that the covered entity may not have accumulated a full package size on January 1, 2026, when they are transitioned to a rebate model.

### *Administrative Costs and Other Burdens*

34. Commenters also raised concerns about administrative costs. As explained above, covered entities that choose to participate in the 340B program derive a significant financial benefit from it. Their participation in the 340B Program is voluntary and has always entailed certain compliance, operational, and other costs. OPA designed the Pilot Program with the aim of minimizing any additional administrative costs and burdens attributable to the Pilot and ultimately determined that the potential significant added benefits of the Pilot—gathering information on the feasibility of rebates, helping to collect data for future rebate models consistent with the 340B statute and Administration priorities, improving transparency, addressing manufacturer concerns about 340B-MFP deduplication, and facilitating the prevention of 340B Medicaid duplicate discounts and diversion—outweighed these costs.

35. OPA is currently examining the comments alleging an under-estimation of administrative costs in the context of the Paperwork Reduction Act Notice, 90 Fed. Reg. 44,197 (Sept. 12, 2025). OPA will address those concerns in the context of finalizing that notice.

36. As for the need to provide claims data to receive rebates, most covered entities already provide the type of claims data they will need to provide under the Pilot. Since at least 2021, in connection with manufacturer contract pharmacy policies, many covered entities have been submitting claims data to 340B ESP, an IT platform owned by the company Second Sight Solutions, which also operates the rebate model IT platform. OPA purposefully did not require covered entities to submit any new pharmacy and medical data elements beyond which most were already submitting either as part of the manufacturer contract pharmacy claims submission process or which most had readily available through third party administrators.

37. For example, OPA rejected proposals from manufacturers to require submission of a set of data tied to the purchase of the drug (e.g., specific invoice data, detailed wholesaler account information, and purchase account information) to avoid creating additional burdens on covered

entities as this element was not something that could be easily produced by many covered entities at this juncture. While covered entities have access to their purchase records, they do not routinely tie those records to individual dispensing records. Requiring this reconciliation would create a significant administrative burden on covered entities.

38. To elaborate, in all the plans, manufacturers sought to collect purchase data from covered entities. Manufacturers relayed that the purchase data was necessary to improve the integrity of the Pilot. They also claimed it was needed to provide visibility into 340B transactions. In particular, manufacturers thought this data would allow them to verify that the claims data submitted by covered entities showed that the drug was purchased at WAC, thus triggering the request for a rebate. In addition, manufacturers wanted to verify that there were purchases made to warrant a rebate request. OPA considered the request from manufacturers but ultimately decided against approving the collection of purchase data. It did so to avoid placing undue burden on covered entities as this information is not readily available to attach as part of the claims submission and would cause additional burden for covered entities to produce. OPA was also of the view that manufacturers could, at this juncture, use information provided by their wholesale partners to determine that there were sufficient WAC purchases to compare with rebate requests. The final approval letters to manufacturers reflected OPA's reasoned thinking on this issue and that purchase data was not necessary at this initial phase of the Pilot.

39. As another example, in all of the plans, manufacturers sought to collect medical claims data from covered entities. This was in addition to the pharmacy claims data that OPA was requiring covered entities to submit to obtain a rebate payment under the Pilot. Regarding this request, OPA considered the justification provided by the manufacturers and agreed that the data would be necessary to effectuate 340B rebates for physician-administered drugs. Medical claims data include different data than pharmacy claims data due to how the drug is received by the patient: instead of the RX number that would be supplied by a pharmacy dispense, the medical claims corresponding data field would be

the claim number. This is the type of data that is generated when a drug is administered by a physician as opposed to being dispensed at a pharmacy. In addition, OPA found that the medical claims data was analogous to pharmacy claims data used to identify 340B eligible claims and would therefore not cause additional burden for covered entities to produce as part of their claims submission when requesting a rebate.

40. Public comments submitted in response to the notice also identified the concern that the rebate model would cause difficulties with state Medicaid programs that reimburse at actual acquisition cost (AAC) and difficulties in providing sliding fees to uninsured patients. Under the upfront discount model, covered entities receive pricing files with 340B ceiling prices from wholesalers that feed the pharmacy billing systems, which allow covered entities to bill at AAC and allow for sliding fees that share savings with eligible patients. This would not exist under the rebate model because the 340B ceiling price will no longer be present in the pricing files from wholesalers for drugs in the rebate model. The WAC price, not the 340B ceiling price, will appear in the pricing files. Therefore, as OPA reviewed the plans, it became apparent that covered entities would need a separate pricing file to understand better what their ultimate rebated amount would be to help them plan. OPA requested that each manufacturer work to provide a supplemental pricing file with the 340B ceiling prices to assist covered entities with the Medicaid billing requirements and assist with providing patients with the shared savings. This file will be available for download on the rebate model's IT platform. The 340B OPAIS pricing component is also available for verification of the accuracy of the manufacturer provided files.

41. OPA considered the non-monetary costs associated with moving to a rebate model. Covered entities have asserted that a rebate model would affect patient care by limiting the availability of drugs and by reducing the benefits covered entities derive from participating in the 340B Program. Manufacturers have argued that implementation of a rebate model would not affect patient care, will not affect patient access to drugs, and will not affect covered entity participation in the 340B Program.

OPA does not believe that the rebate model will have a significantly negative impact on patient care as the rebate model is designed only to change the form of the 340B discount, not restrict the savings received by 340B covered entities for the drugs included in the Pilot. OPA does not think a ten-day lag in receiving a rebate payment will harm patients or communities that indirectly benefit from the 340B Program. These types of concerns are the reason, in part, why OPA greatly restricted the scope of the Pilot, so that it could further evaluate any unforeseen consequences of a Pilot without endangering the entire 340B Program.

### *Concerns about the Beacon Software Platform*

42.   To balance the interests of covered entities and manufacturers, OPA imposed several requirements on manufacturers participating in the Pilot regarding the IT platform a manufacturer would use to collect and store rebate claims data.

43.   Manufacturers were required to, among other requirements: 1) provide covered entities and other impacted stakeholders with 60 calendar days' notice before implementation of the rebate model, with instructions for registering with any IT platform; 2) provide a technical assistance/customer service component and ensure that opportunities to engage with the manufacturer in good faith regarding questions or concerns are made available to covered entities through both the IT platform and a point of contact at the manufacturer; 3) ensure that the IT platform has assurances in place to ensure that the data is secure and protected and collection of the data is limited to the elements identified by OPA as necessary for providing 340B rebates pursuant to section 340B(a)(1) of the PHSA; 4) ensure that the IT platform has mechanisms in place to protect patient identifying information, which is required to be maintained in a manner consistent with the Health Insurance Portability and Accountability Act of 1996 and any other applicable privacy and data security laws; 5) ensure that the IT platform will have the capacity to receive data that will filter and use only the data required to effectuate the rebate (e.g., if drugs other than the selected drugs under the MDPNP included within the Pilot Program are submitted, the IT platform will be able to identify

13

and discard unneeded data); and 6) ensure that the IT platform will have the capability to provide real-time reconciliation reports for covered entities to be informed of the rebate status of submitted claims.

44. All manufacturers that were approved by OPA to participate in the Pilot selected Beacon Channel Management (Beacon) as their chosen IT platform. OPA did not select Beacon or in any way influence the selection of Beacon. Beacon is a private company that is an ancillary stakeholder in the 340B space, but OPA has no legal authority over Beacon. Although OPA cannot compel Beacon to act in a certain manner, it reserves the right to revoke approval of a manufacturer plan at any time if the manufacturer fails to comply with the program's criteria, including by failing to ensure its IT platform is complying with the above requirements. Also, the health care and pharmaceutical sectors are heavily regulated, and numerous federal and state laws beyond the 340B statute already exist to address unlawful conduct regarding privacy and data security.

45. There are many third-party contractors that operate in furtherance of the 340B Program. These stakeholders include wholesalers, specialty distributors, contract pharmacies, third party administrators, consultants, auditors, and pharmacy benefit managers, among others. The use of Beacon is entirely consistent with these other aspects of the 340B Program. As is the case with Beacon, OPA exercises no regulatory oversight over these stakeholders. While OPA is aware of many contracts or agreements that covered entities, for example, may enter into with these stakeholders, OPA is not involved in negotiating, setting, or even reviewing beforehand the terms and conditions of these private agreements and would only become involved to the extent there is activity that conflicts with a covered entity's (or a manufacturer's) 340B obligations. Although the Beacon IT platform is not entirely new to most covered entities because of their experience with 340B ESP (the IT platform many covered entities use in connection with manufacturer contract pharmacy policies), OPA understood that purchasing covered outpatient drugs via rebates would be a new endeavor. Consequently, OPA stipulated the requirements listed above and other guardrails to minimize the compliance costs and administrative burden for covered entities adopting the new rebate mechanism.

46. To conclude, each manufacturer seeking approval to join the Pilot made its own business decision regarding the IT platform it would use to facilitate its participation. While OPA did not select Beacon, after reviewing the manufacturer plans, it believed there were potential advantages to having all manufacturers in the Pilot using the same IT platform. In submitting and adjudicating rebate claims, covered entities would only need to acclimate to one IT service provider rather than multiple service providers with different digital platforms and rules of engagement. OPA believed a single IT platform would further minimize any perceived or actual burden on covered entities.

### *OPA Will Ensure Compliance and Evaluate the Pilot Program Moving Forward*

47. Since announcing the approved manufacturer plans, OPA has met with various stakeholders to discuss the Pilot. Compliance and evaluation of the Pilot will be part of OPA's ongoing work. Compliance with 340B obligations by manufacturers and covered entities will be assessed through data reporting by the manufacturers and through audits for both covered entities and manufacturers. Evaluation of the Pilot will also be conducted through data and reports received from the participating manufacturers on the effectiveness of the model and covered entity and other stakeholder feedback.

48. OPA continues to encourage stakeholders to reach out with their questions and concerns, and OPA is engaging with trade organizations that represent covered entities and manufacturers regularly. OPA is collecting questions and regularly updating the OPA website that houses frequently asked questions to clarify issues that can be resolved prior to implementation.

49. OPA is also working closely with CMS to understand how the implementation of the Pilot may impact the Medicaid and Medicare programs. OPA is working with CMS to receive feedback from their stakeholders about how these stakeholders believe the Pilot is working.

50. Finally, OPA is designing a mechanism by which covered entities and manufacturer stakeholders can begin to submit their feedback once the Pilot is operational in January.

In accordance with 28 U.S.C. § 1746, I declare, under penalty of perjury, that the above information is true and correct to the best of my knowledge and belief.

Signed this 15th day of December 2025.

_____

Chantelle Britton, M.P.A., M.S.
Director
Office of Pharmacy Affairs
Health Resources and Services Administration