UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR. Secretary of the U.S. Department of Health and Human Services, et al.,<br>　　　Defendants. | Case No. 2:25-cv-00600-LEW<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**[1] |

**PRELIMINARY STATEMENT**

Defendants' opposition proves why preliminary relief is critical and warranted—not only because safety-net hospitals face immediate and irreparable harm that will hamper patient care, but also because the Defendants are unprepared for their own January 1, 2026 deadline.

The opposition brief is fatally revealing in three respects. *First*, Defendants spend many pages trying to escape this Court's review. Their arguments about "final agency action" and "agency discretion" are meritless, but their desire to avoid judicial review speaks volumes. *Second*, their brief rests their entire merits case on an impermissible "litigation affidavit" containing purely *post hoc* rationalizations for a barren administrative record. *DHS. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23 (2020). More important, even if that "litigation affidavit" could be considered, it only proves Defendants' many Administrative Procedure Act violations. To take one dispositive example, the affidavit makes the crystal-clear concession that Defendants have not yet analyzed the costs of their program, *see* Declaration of Chantelle Britton, ECF Doc. 75-1 ("Britton Decl.") ¶ 35, rendering it impossible for them to have weighed costs and benefits, as the APA requires.

---

[1] As noted in Defendants' Opposition (ECF Doc. 75) ("Def. Opp."), the parties have agreed to litigate Plaintiffs' Motion for a Temporary Restraining Order as a Motion for a Preliminary Injunction. On a December 8, 2025 status conference call, Judge Woodcock granted Plaintiffs a page limit extension to 14 pages for this reply.

1

*Third*, Defendants do not specifically contest, let alone refute, the many harms to hospitals, patients, and communities set forth in Plaintiffs' several declarations, including those submitted by St. Mary's and the Maine Hospital Association. Nor do they contest that the millions being spent to prepare for the 340B Model Pilot Program ("Rebate Program") are unrecoverable. Put another way, they do not disprove irreparable harm.

This Court has clear authority to temporarily set aside Defendants' approvals of the drug company applications, 5 U.S.C. §§ 705, 706(2); Compl. Prayer for Relief ("any other relief the Court deems necessary and just"), which they admit officially commenced their unlawful Rebate Program, *see* Def. Opp. 11. It should halt the January 1, 2026 effective date, preserve the status quo, and allow this case to proceed before those irreparable harms grow even greater.

## ARGUMENT

**I.     Defendants' Approvals of Drug Company Applications Are Reviewable.**

*A. Plaintiffs Challenge Final Agency Action.*

Plaintiffs challenge "final agency action" within the meaning of the APA. An agency's action is final when two criteria are met: (1) it is the consummation of the government's decision-making process and (2) the action is "one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). Despite spilling a lot of ink quibbling about what parts of the "Rebate Program" constitute a final agency action, the government concedes that, at minimum, Defendants' approval of drug companies' rebate plans on October 30 and November 14, 2025, were final agency actions that officially triggered legal consequences for Plaintiffs and their members. Def. Opp. 11. That concession is enough for purposes of the present motion.[2]

---

[2] Separate from the October and November approvals, HRSA's notice in August 2025 also constituted a final agency action. That Notice "announced the availability of a 340B Rebate Model Pilot Program[,]" Britton Decl. ¶ 8, a policy

2

### B. Defendants' Actions Were Not "Committed To Agency Discretion By Law."

There is a "strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). Thus, the APA's committed-to-agency-discretion exception is "quite narrow[]" and applies only in "rare circumstances." *Id*. This is not one of them. "Even when an agency is afforded broad discretion," its "authority is rarely absolute." *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 170 (1st Cir. 2021). Accordingly, this Court should reject Defendants' claim of unchecked authority over a program involving tens of billions of dollars and tens of millions of patients, including the power to impose hundreds of millions of unrecoverable costs on hospitals without those hospitals having any judicial recourse.

Defendants do not contend that their actions are akin to those "courts have traditionally regarded as unreviewable[.]" *Weyerhaeuser Co.*, 586 U.S. at 23. Instead, they insist that the Court has no "benchmark against which to measure the agency's exercise of discretion[.]" Def. Opp. 13. But Defendants have long acknowledged that the Secretary must approve upfront discount or rebate models based on "the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'" H.R. Rep. 102-384, pt. 2, at 16 (1992).[3] Defendants adopted this standard in legal filings, including as recently as August:

> The House Committee Report [on the 340B statute] explained that the law "does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other

---

that had never existed before. In so doing, HRSA mandated that all 340B "covered entities" would be subject to approved rebate programs effective January 1, 2026. 90 Fed. Reg. 38165 (2025). The Notice therefore was the consummation of the government's decision-making and imposed obligations on covered entities, making it a final agency action.

[3] Courts and HRSA have repeatedly relied on this Committee Report to explain the 340B statute. *E.g.*, *Johnson & Johnson Health Care Sys. Inc. v. Kennedy*, 2025 WL 1783901, at *2, 9 (D.D.C. June 27, 2025); *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 315–16 (D.S.C. 2023). For example, in *Johnson & Johnson*, the Court quoted the Report to explain the 340B program's purpose of allowing safety-net hospitals and clinics to "stretch scarce Federal resources as far as possible." 2025 WL 1783901, at *9; *see also* Def. Opp. 4 (citing Report and agreeing with purpose of 340B program). This purpose, too, provides a standard against which Defendants' decisions can be evaluated, as agency actions "unmoored from the purposes and concerns" of the laws they purport to implement "cannot pass muster under ordinary principles of administrative law." *Judulang v. Holder*, 565 U.S. 42, 64 (2011); *see* Compl. ¶ 163.

> mechanism." H.R. Rep. No. 102-384, pt. 2, at 16. Because a mechanism that might be appropriate for one context might not work for another, the Committee "expect[ed] that the Secretary of HHS, in developing these [pricing] agreements, *will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'*" Id.

*Novartis Pharms. Corp. v. Kennedy*, No. 25-5177 (D.C. Cir. Aug. 1, 2025), ECF Doc. 2128443 at 25 (emphasis added); *see also Johnson & Johnson*, No. 24-cv-03188 (D.D.C. 2024) ECF Doc. 42 at 10. Defendants originally adopted this standard years ago in connection with their lone approval of a rebate model for a particular type of covered entity. *See* 62 Fed. Reg. 45823, 45824 (1997) (explaining that when deciding whether to apply upfront discounts or rebates, "the Secretary of HHS . . . will use the mechanism that is the most effective and most efficient" and that "[a]lthough the discount system is functioning successfully for most covered entities, most ADAPs have drug purchasing systems that have prevented their participation in the section 340B discount program"). In fact, Defendants quote the operative Committee Report in their brief, Def. Opp. 12, but they selectively quote only the discussion of the Secretary's discretion and omit the language about the parameters within which this discretion is to be exercised and evaluated. Read in full, the Report makes clear this Court can easily review the reasonableness of the Secretary's decision about which "mechanism [] is the most effective and most efficient from the standpoint of each type of 'covered entity,'" H.R. Rep. No. 102-384, pt. 2 at 16, in evaluating Defendants' action under the APA.[4]

---

[4] *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (holding that regulations can provide "judicially manageable standards"); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) ("[J]udicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes." (cleaned up)); *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) ("[C]ourts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action" for judicially manageable standards); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020) (citing language from a House Report as providing a "meaningful tool" for judicial review when rejecting a claim that there was no "judicially manageable standard"); *Page v. Donovan*, 727 F.2d 866, 868 (9th Cir. 1984) ("Even if the statute is drawn broadly, review is not precluded if the legislative history offers standards that a reviewing court can apply."); *see generally* Charles Allen Wright & Arthur R. Miller, 33 Fed. Prac. & Proc. Judicial Review § 8325 (2d ed.) ("Statutes are not the only place to find "law to apply" to justify reviewability.… Agency rules, policies, and precedents can as well.").

Defendants' sudden abandonment of this standard is especially peculiar, given that the same Defendants agreed in litigation this year that the decision to deny a rebate program *was* subject to judicial review. *Sanofi-Aventis US LLC v. Kennedy*, No. 24-cv-3496 (D.D.C. Mar. 27, 2025), ECF Doc. 41-1 at 14–22. Defendants offer no explanation why, under the 340B statute, drug companies would be permitted to contest their decision denying a rebate program, but 340B hospitals would not be able to contest their decision to approve one. Defendants also overlook the fact that Judge Friedrich *this year* reviewed and set aside a decision by HRSA related to a rebate program, finding the agency's actions "arbitrary and capricious" under the APA based on its "fail[ure] to provide a reasoned explanation" for disregarding the drug company's concern. *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *11–14 (D.D.C. May 15, 2025).[5]

## II.     Plaintiffs Are Even More Likely to Succeed on the Merits of Their APA Claims.

### A. The Court Should Reject Defendants' Post Hoc *Justifications*.

To defend the reasonableness of their decision, Defendants rely almost exclusively on a declaration, signed this week, from Director Britton. It is a new record generated solely for purposes of this lawsuit, and therefore this Court should disregard its *post hoc* rationalizations.

As the Supreme Court recently held, *post hoc* "litigation affidavits" and other "belated justifications" are prohibited in APA proceedings because considering them would undermine "important values of administrative law." *Regents of the Univ. of Cal.,* 591 U.S. at 22–23; *id.* at 23 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419 (1971), for its "rejecting 'litigation affidavits' from agency officials as 'merely *'post hoc'* rationalizations'"); *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025). This holding includes declarations like

---

[5] These cases are on appeal to the D.C. Circuit, but Defendants did not cross-appeal on the question of whether their decision to reject a rebate model was "committed to agency discretion," nor did they raise the issue in district court.

5

Director Britton's and prohibits all "*post hoc* rationalizations, not [just] advocate rationalizations, because the problem is the timing, not the speaker." *Regents of the Univ. of Cal.*, 591 U.S. at 23.

Every point in the Britton Declaration that was not in the contemporaneous record—and there are many—is an independent concession about what Defendants' failed to do under the APA. For example, the Britton Declaration is the exclusive means by which the Defendants argue that they considered: (a) the 1,100 comments and the important aspects of the problems identified therein, Def. Opp. 7, 16; (b) upfront and non-monetary costs, Def. Opp. 17; and (c) reasonable and obvious alternatives, Def. Opp. 18. After-the-fact efforts like these are precluded because they "upset the orderly functioning of the process of review, forcing" Plaintiffs and this Court to "chase a moving target"—here, on an exceedingly short timeframe. *Regents of the Univ. of Cal.*, 591 U.S. at 23. It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency *invoked when it took the action*," *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015) (emphasis added), and none of the explanations offered by Director Britton in her declaration were invoked by Defendants when they approved drug company applications in October and November.[6] Such "newfound claim[s] of clarity approach[] the sort of 'post hoc rationalization' that [courts] cannot allow." *U.S. Dep't of Educ.*, 132 F.4th at 99.

B. *Defendants Concede That They Did Not Properly Calculate or Weigh Costs.*

Even with its *post hoc* rationalizations, the Britton Declaration, on its own terms, fails to satisfy the APA's substantive requirements. Most significantly, it contains a critical confession—that Defendants never fully and properly accounted for administrative costs. Specifically, the

---

[6] Defendants' single footnote citation to a twenty-nine year old case, *Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996), does not help them. In *Clifford*, the district court allowed a declaration "to provide the court with background information about the subsidy program and the current state of the American shipping industry," *i.e.*, helpful information for the court that was already "well known to the agency and to the parties." *Id.* at 1418. By contrast, Defendants rely on the Britton Declaration to address—for the first time—subjects that are entirely absent from the administrative record, including responses to only a handful of the problems identified in the 1,100-plus comments.

6

declaration admits Defendants are "currently examining the comments alleging an under-estimation of administrative costs in the context of the Paperwork Reduction Act Notice . . . [and] will address those concerns in the context of finalizing that notice." Britton Decl. ¶ 35.

Admitting that Defendants are still evaluating how many hundreds of millions of dollars in administrative costs this program will impose—more than six weeks after approving the rebate programs set to take effect on January 1—is a clear admission that Defendants "failed to consider an important aspect of the problem" before reaching their decision. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* Compl. ¶ 144 & n. 12. Notably, Defendants do not dispute that an "[a]gency must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary." *Michigan*, 576 U.S. at 759. They do, however, admit that they did not do so. In failing to calculate or consider costs *before* approving the drug company applications, Defendants got the administrative process exactly backwards—greenlighting exorbitant administrative costs *and then* calculating them. That is paradigmatically arbitrary and capricious.

Defendants' concession about their incomplete assessment of administrative costs makes other claims in the Britton Declaration internally inconsistent and therefore unlawful. *See Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214–15 (D.C. Cir. 2018). For example, Director Britton's representation that Defendants "determined that the potential significant benefits of the [Program] . . . outweighed these [administrative] costs," Britton Decl. ¶ 34, is impossible because Defendants are still evaluating what the actual costs are. *E.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record … cannot survive review under the arbitrary and capricious standard."). Similarly, her statement that

7

Defendants "reviewed the comments and considered suggestions and concerns raised therein when evaluating the application," Britton Decl. ¶ 12, cannot be true, since elsewhere the Declaration noted that "[c]ommenters also raised concerns about administrative costs" that Defendants still have not resolved. Britton Decl. ¶ 34. These inconsistencies prove that, even if this declaration were not a *post hoc* rationalization, it still would not fix Defendants' APA violations.

This failure to consider costs should be dispositive. "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate . . . [because] reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan*, 576 U.S. at 752–53. Defendants still have no idea whether the Rebate Program will require "too much wasteful expenditure devoted to one problem[, which] may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems." *Id.* at 753. Defendants cannot disregard this basic APA requirement, particularly because these unanalyzed costs will fall on America's most vulnerable patients and communities.

### C. Even With Post Hoc *Rationalization, Defendants Still Fail to Reasonably Explain Other Key Aspects of Their Decision-Making.*

The Britton Declaration's *post hoc* rationalizations also do not correct Defendants' other APA violations, as highlighted by the following examples:

**Reliance Interests**. Defendants cite to a single sentence in the Notice that "rebate models could fundamentally shift how the 340B Program has operated for over 30 years." 90 Fed. Reg. 38165 (cited Def. Opp. 15). But this reference to a "shift" is not the "more substantial justification" required for a changed policy, which is what occurred here. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015). Defendants were "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. Defendants have elsewhere acknowledged

8

that 340B providers have significant reliance interests in, among other things, not having to pay higher upfront costs. *See* Compl. ¶¶ 43, 45, 136 (citing letters to drug companies); 62 Fed. Reg. 45823 ("Covered entities generally preferred a discount system, because they could negotiate lower prices and needed less initial outlay of drug purchasing money"). Yet there is no discussion in the contemporaneous record (beyond the lone conclusory statement in the Notice) about the significance of these reliance interests and why they are now outweighed.

**Pilot Program Design/Less Burdensome Alternatives**. The Britton Declaration states that "another important goal of the Pilot is to collect information on the experience of a wide variety of covered entity types," Britton Decl. ¶ 24, but that does not explain why variety could not be achieved without *all* covered entities. It is possible to design a program with different "covered entity types" without imposing massive costs on *every* covered entity.

Likewise, although Defendants try to defend their program design by claiming that "the ten drugs chosen for the Pilot represent only 2% of total sales in the 340B Program." Def. Opp. 7, 15, that is disingenuous and, ultimately, not responsive to the comments they received. These drugs were selected for Medicare price negotiations precisely because they are the *most expensive* drugs in Medicare Part D (over $50 billion from 2022 to 2023). *See* 42 U.S.C. § 1320f-1(d)(1) (negotiation-eligible drugs have the "highest total expenditures" under Medicare Part D). And even if this 2% figure mattered, Defendants do not sufficiently explain why they did not choose to test even fewer or cheaper drugs to minimize the impact on safety-net hospitals even further.

**Beacon**. The Britton Declaration states that HRSA "imposed several requirements on manufacturers" regarding their choice of an IT platform. Britton Decl. ¶¶ 42–43. But then Director Britton washes Defendants' hands of any responsibility over Beacon, including its one-sided contract. *Id*. ¶¶ 44–45. Defendants nowhere explain why, as numerous commenters requested, fair

9

contract terms could not have been one of their conditions. Nor does Director Britton dispute that Defendants have not even tested the platform to determine whether it will function properly on January 1.[7] Compl. ¶ 122. The problems with Beacon continue to grow, just as commenters predicted. Golder Supp. Decl. ¶¶ 6–8. This wholesale abdication of agency authority over a key component of the Rebate Program further demonstrates how Defendants acted arbitrarily and capriciously. *See Texas Off. of Pub. Util. v. F.C.C.*, 265 F.3d 313, 328 (5th Cir. 2001) ("An agency abdicates its role as a rational decision-maker if it does not exercise its own judgment, and instead cedes near-total deference to private parties[] . . . .").

**Dispute Resolution**. Despite receiving many comments about this problem, *see* Compl. ¶ 79, Defendants admit that they have not "create[d] a mechanism through which covered entities will be able to report to OPA when the covered entity is unable to secure a rebate." Britton Decl. ¶ 32. Defendants cannot argue that covered entities are in no danger of floating and losing operating capital (or having to expend resources to chase down drug company denials) while simultaneously admitting they have not stood up a process to address disputes over denied rebates.

In sum, Defendants did not assess costs or weigh them against benefits; invoke a reasonable explanation at the time of their decision-making; consider less burdensome alternatives; or consider a host of other important parts of the problem. All constitute independent APA violations and grounds for setting aside the drug application approvals done through the Rebate Program. With or without the Britton Declaration, Defendants' explanations do not satisfy the APA.

### III. Plaintiffs Face Irreparable Harm Absent Preliminary Relief.[8]

---

[7] A Beacon representative has represented that he conducted a "demonstration of the Beacon platform" during which the "HRSA team observed the functionality of the platform and had the opportunity to ask questions," but he, too, does not dispute that HRSA has not actually tested the platform under real-world conditions. ECF Doc. 72-1 ¶¶ 4, 6.

[8] The putative intervenors have filed submissions on their purported irreparable harms and seek to turn this motion into a policy debate over whether the interests of hospitals or drug companies should take precedence in considering the "public interest." *See* ECF Doc. 72 at 15, 18–19; ECF Doc. 73. This is inappropriate. Whether these motions to

Defendants do not contest that the Rebate Program will impose hundreds of millions of dollars in annual compliance costs upon 340B providers, including Plaintiffs.[9] Individual Plaintiffs filed unrefuted declarations explaining how those costs will materialize—by being forced to hire more employees, increased vendor fees, and so on. *E.g.*, ECF Docs. 5 ¶ 21; 6 ¶ 22; 8 ¶ 18; 9 ¶ 18. Plaintiff AHA calculates that its members next year will collectively face $400 million in compliance costs—an average of over $7.5 million per week starting January 1, 2026.[10] ECF Doc. 7 ¶ 28. "[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658 (2025) (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). Here, because Plaintiffs seek relief under the APA, "they have no recourse to recover incurred costs if the challenged regulations are later found invalid. Thus, . . . plaintiffs have demonstrated irreparable economic harm." *California v. Kennedy*, __ F. Supp. 3d __, 2025 WL 2807729, at *6 (D. Mass. Oct. 1, 2025); *see also Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57–60 (D.D.C. 2020) (same).

Separately, Defendants callously dismiss the harm to Plaintiffs' mission as "fundamentally economic." Def. Opp. 21. This argument overlooks that "340B hospitals perform valuable services for low-income and rural communities," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022), and fails to address the real-world harms that this program will impose. As Plaintiffs have

---

intervene are ultimately granted, Plaintiffs are not seeking to preliminary enjoin drug company conduct, so the putative intervenors have "no standing to submit a 'response' to" Plaintiffs' motion. *See Reed & Reed, Inc. v. Weeks Marine, Inc.*, 2004 WL 256335, at *9 n.11 (D. Me. Jan. 9, 2004).

[9] Defendants try to argue that these costs are not irreparable "given the financial benefits that flow to Plaintiffs due to 340B discounts." Def. Opp. 21. Whether the Plaintiffs are beneficiaries of a congressionally enacted program has nothing to do with whether they are *separately* being harmed by an agency's failure to follow the law.

[10] Defendants' own initial estimate amounts to a weekly average of $3.75 million in compliance costs for 340B providers. ECF Doc. 10-30 at 6 (estimating $200.4 million in annualized costs for covered entities). Defendants cannot contest Plaintiffs' calculation of the true costs because they are still assessing them. Britton Decl. ¶ 35.

11

explained—again, in uncontested declarations—they are being forced to delay necessary projects and will be forced to cut healthcare services (like remote cancer treatment and opioid addiction treatment) so they can husband enough resources to comply with the Rebate Program. ECF Doc. 3 ("Mot.") 18–19. As they get closer to January 1, 2026, 340B hospitals, including members of Plaintiffs AHA and MHA, are also finding that their ability to distribute drugs is now impaired. Large pharmacies like Walgreens and Walmart have notified hospitals that they are partially suspending partnerships through which they distribute providers' 340B drugs on behalf of hospitals, impairing patients' ability to get necessary drugs closer to where they live.[11] Golder Supp. Decl. ¶¶ 2–4. Such real-world non-economic harms clearly qualify as irreparable.

Defendants argue instead that any harm to the hospitals is not irreparable unless it "threaten[s] the very 'survival' of Plaintiffs' businesses." Def. Opp. 21. But a threat to survival is not necessary: "a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Plaintiffs need not wait to seek relief until Defendants' actions close entire hospitals; the grave and imminent threats to current service lines and other patient care programs amply establish a likelihood of irreparable harm. *See* Mot. 18–19; ECF Docs. 5–6, 8–9.

IV.     **The Balance of the Equities Favors Plaintiffs.**

Defendants do not dispute that there is "no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (citation omitted); *see* Def. Opp. 22; Mot. 19–20. Moreover, Defendants' decision to not approve Novartis to begin any Rebate Program until April 1 (rather than January 1) shows that they face no grave

---

[11] Walgreens' reaction to the Rebate Program will have the exact harmful effects on Maine patients and hospitals that the Maine legislature sought to prevent when it enacted, on a bipartisan basis, the "Protect Health Care for Rural and Underserved Communities Act," L.D. 210, Sec. P-5 (132d Legis. 2025). *See Novartis Pharms. Corp. v. Frey*, 2025 WL 2813787, at *9 (D. Me. Sept. 23, 2025), appeal docketed, No. 25-1914 (1st Cir. Sept. 26, 2025).

harm from delaying the Rebate Program a few months to allow this Court time to fully consider the merits. Additionally, Defendants ignore First Circuit precedent holding that infringing access to medical care is against the public interest, *see* Mot. 19–20, arguing only that harm to patients cannot show irreparable injury to Plaintiffs. Def. Opp. 21–22. Defendants' position that they do not expect "a significantly negative impact on patient care," Britton Decl. ¶ 41, admits that they expect *some negative impact* on patient care, thereby proving that the equities favor Plaintiffs.

V.  **This Court Has Full Authority to Issue Preliminary Set-Aside Relief.**

The APA provides courts with the authority to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), and to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," *id.* § 705. Plaintiffs ask this Court to exercise that authority to preliminarily set aside Defendants' approvals of the nine drug company applications (which Defendants say commences their Rebate Program) until this case can be fully briefed and decided by this Court.

At a December 8, 2025 conference, Judge Woodcock asked the parties to address the effect of the Supreme Court's recent ruling in *Trump v. CASA, Inc.* on APA cases such as this.[12] The short answer is that there is no effect. *CASA* expressly did not address or alter district courts' power to vacate federal agency action under the Administrative Procedure Act. 606 U.S. 831, 847 n.10 (2025). Indeed, in his concurring opinion, Justice Kavanaugh explained that plaintiffs in APA cases retained the option to "ask a court to preliminarily 'set aside' a new agency rule." *Id.* at 869, 874 (Kavanaugh, J., concurring). Subsequently, Chief Justice Roberts and Justices Sotomayor, Kagan, and Jackson have also confirmed that vacating federal agency action "falls well within the scope

---

[12] Judge Woodcock also asked the parties to address whether Plaintiffs AHA and MHA qualify for associational standing. Defendants do not contest that the AHA (or MHA) meet the requirements for associational standing. *See* Def. Opp. 23 n.8. Plaintiffs agree that they have made the requisite showing. *See Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025); *President & Fellows of Harvard Coll. v. HHS.*, 2025 WL 2528380, at *18 (D. Mass. Sept. 3, 2025).

13

of the District Court's jurisdiction under the Administrative Procedure Act," even though this relief "has prospective and generally applicable implications." *Nat'l Inst. of Health*, 145 S. Ct. at 2663 (Roberts, C.J., concurring in part and dissenting in part).

Consistent with these opinions and the APA itself, courts considering the scope of preliminary relief under the APA after *CASA* have uniformly held preliminary set-aside relief to be appropriate. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148 n.17 (D.D.C. 2025); *City of Chicago v. U.S. Dep't of Homeland Sec.*, 2025 WL 3171302, at *2 (N.D. Ill. Nov. 13, 2025); *see also Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119 & n.19 (D. Md. 2025) ("Like every other court to consider this issue since *CASA*, this Court believes the APA has always expressly authorized vacatur . . . ."), *appeal docketed*, No. 25-2228 (4th Cir. Oct. 15, 2025).

Defendants ignore this case law, instead arguing that relief needs to be limited to named members of the AHA or MHA. That position is doubly wrong. *First*, it ignores the above-described case law holding that courts retain their authority to preliminarily set aside agency decision-making under the APA. *Second*, it ignores recent First Circuit precedent rejecting *the exact argument* Defendants make here. *Doe*, 157 F.4th at 80 ("To the extent that the Government means to argue that the preliminary injunction may bar enforcement of [government action] as to only the two members whom the organizations identified in seeking associational standing, we cannot agree.").

## CONCLUSION

This Court should grant Plaintiffs' motion and preliminarily set aside all drug company rebate programs approved by HRSA under its Rebate Program under 5 U.S.C. § 706(2)(A).

Dated: December 18, 2025

Respectfully submitted,

*/s/ Karen L. Dunn*
Karen L. Dunn*
L. Rush Atkinson*
Lyle W. Gruby*
Jenifer N. Hartley**
Tyler T. Mikulis**
**Dunn Isaacson Rhee LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
ratkinson@dirllp.com
lgruby@dirllp.com
jhartley@dirllp.com
tmikulis@dirllp.com

Melissa A. Hewey
Jennifer S. Riggle
**Drummond Woodsum Attorneys At Law**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
jriggle@dwmlaw.com

*Admitted pro hac vice.*
**Admitted in NY only; practice supervised by members of D.C. Bar. Admitted pro hac vice.*